FILED

B088

NOV 28 2023

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 23- 251 |
| v. | (18 U.S.C. §§ 1343, 1957(a)) |
| CHARLES W. LANTZMAN | [UNDER SEAL] |

## INDICTMENT

The grand jury charges:

### COUNTS ONE THROUGH SIX

#### Introduction

At all times material to this Indictment, in calendar years 2017 through 2019:

1.      The defendant, CHARLES W. LANTZMAN, (hereinafter LANTZMAN), resided within the Western District of Pennsylvania.

2.      LANTZMAN resided at an address in Pittsburgh, Pennsylvania 15211.

3.      Snow and Ice Management Company of Pennsylvania (hereinafter SIMCO) was a business owned and operated by LANTZMAN, which had a principal place of business at 2020 Knott St., Pittsburgh, PA, 15233, on the North Side of the City of Pittsburgh, within the Western District of Pennsylvania.

4.      LANTZMAN caused SIMCO to maintain a business bank account through PNC Bank—in particular, an account in the name of Snow and Ice Management Co. of Pa. Inc., with an account number ending in 1013.  LANTZMAN had signatory authority on this account.

5.      It was the business of SIMCO, in part, to provide services for commercial customers relative to the removal of snow and ice during winter weather.  SIMCO contracted with

hundreds of subcontractors to service approximately 800 customers in at least seven states. SIMCO operated in essentially the following manner:

      a.    SIMCO entered into agreements with subcontractors who owned and operated their own trucks with plows and salt application equipment (e.g., shovels).

      b.    Among the services offered by SIMCO, through its contracts with the subcontractors, were the following:

      i.    Removal of snow from surface areas of places like parking lots, access roads, driveways, and sidewalks by plow and/or shovel;

      ii.    Removal of ice from surface areas of places like parking lots, access roads, driveways and sidewalks; and

      iii.    Application of salt or similar substances to aid in ice removal and/or the prevention of ice formation and accumulation from a variety of surface areas.

      c.    SIMCO entered into and maintained the arrangements and agreements directly with customers of the subcontractors. That is, SIMCO contracted with the parties that needed snow and ice removal services. Those contracts were not held by the subcontractors. Under the SIMCO business model as created, administered, and supervised by LANTZMAN, the subcontractors were not to have direct contact or interaction with the ultimate customers outside of actually performing the work of snow and ice removal and/or salt application.

      d.    SIMCO utilized a system called Crew Tracker to record work done by the subcontractors. As soon as the subcontractor performed any service, they were to input into Crew Tracker, from their remote location, using a cellular telephone, tablet, laptop computer, or similar device, a record of the location at which the service was performed, the services performed (e.g., salt application to sidewalks or snow plowing), and the time that each service was performed.

2

On occasion, the subcontractor would not input the services performed at the actual time the service was performed. On those occasions, the subcontractors were required to report the services they performed to SIMCO within approximately 48 hours.

   e. SIMCO's use of Crew Tracker was essential to keep a record of work done by the subcontractors because SIMCO had no other independent, verifiable basis to determine, over the wide geographic area that SIMCO served, what service had actually been done at each location by each subcontractor. That is, the SIMCO business model, as set up and supervised by LANTZMAN, relied on the subcontractors' self-reporting of the work they had done in order to accurately determine what services had been provided to the customers and therefore what items of service could be billed by SIMCO to the customers.

   f. Employees of SIMCO received the data that was input into Crew Tracker by each of the subcontractors and then converted that information into an invoice/bill that was sent to the customer receiving the service from each particular subcontractor. Other than inputting information into Crew Tracker, the subcontractors played no active role in preparing bills to be sent to the customer.

   g. In some instances, SIMCO office personnel, pursuant to the direction, instruction, and control of LANTZMAN, sent the invoice/bill to the customer by email.

   h. Once the ultimate customer received the itemized invoice/bill for services rendered by the subcontractors, the customer would make payment to SIMCO for the bill either electronically by a payment that went to SIMCO's business bank account at PNC Bank or by mail, sending a check to SIMCO through the United States Postal Service.

i.      SIMCO paid its subcontractors based on the services that the subcontractors reported that they performed.  The amount paid to the subcontractors was less than the amount billed to the customers, with the balance representing SIMCO's portion of the fee.

**The Scheme and Artifice to Defraud**

6.      From in and around January 2017, and continuing thereafter until in and around April 2019, in the Western District of Pennsylvania and elsewhere, LANTZMAN devised and intended to devise a scheme and artifice to defraud customers of SIMCO and for obtaining money and property from the customers of SIMCO by means of false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations and promises were false and fraudulent when made.

**Purpose of the Scheme and Artifice to Defraud**

7.      The purpose of the scheme and artifice to defraud was for LANTZMAN to defraud the customers of SIMCO of hundreds of thousands of dollars by padding the customers' bills with charges for services that were never actually provided.

**Manner and Means of the Scheme and Artifice to Defraud**

8.      It was part of the scheme and artifice to defraud that LANTZMAN added or caused to be added to customer bills services that were never performed by the subcontractors hired by SIMCO.

9.      It was further part of the scheme and artifice to defraud that proceeds from LANTZMAN's scheme were regularly deposited into the SIMCO PNC account ending in 1013 and checks on behalf of the business were issued out of this account.

10.     It was further part of the scheme and artifice to defraud that in order to falsely pad customer bills, LANTZMAN would take possession of documents that were generated

4

based on the information input to Crew Tracker by the subcontractors and, without the knowledge of the subcontractors, would add to various sections of those documents fictitious services that were not in fact performed by the subcontractors at the various customers' locations.

11.     It was further part of the scheme and artifice to defraud that LANTZMAN used and directed SIMCO employees to assist with falsifying bills.

12.     It was further part of the scheme and artifice to defraud that LANTZMAN, through SIMCO, retained customer payments related to the fictitious services added to their bills, with no portion of such payments passed on to the subcontractors.

13.     It was further part of the scheme and artifice to defraud that LANTZMAN concealed from the customers the fact that their bills included services that were never performed by the subcontractors.

14.     It was further part of the scheme and artifice to defraud that LANTZMAN caused fictious services to be added to customer bills on thousands of occasions.

### Statutory Allegations

15.     On or about the dates listed below, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES W. LANTZMAN, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud the customers of SIMCO and to obtain money or property of SIMCO's customers by means of false and fraudulent pretenses and representations, and in attempting to do so, did knowingly cause to be transmitted, by interstate wire, certain signs, signals, pictures, and sounds, consisting of emails sent from SIMCO on or about the dates listed below to the customers listed below, which contained invoices for work that, in relevant part, had not been performed by SIMCO's subcontractors, each such transmission being a separate count of this Indictment:

| Count Number | Approximate Date of Email | Customer Receiving Invoice | Number of Attached Invoice | Amount on Invoice |
|---|---|---|---|---|
| **One** | December 5, 2018 | Company A, Temple, Arizona | 144537 | $585 |
| **Two** | December 6, 2018 | Company B, Overland Park, Kansas | 144942 | $1,523 |
| **Three** | January 25, 2019 | Company A, Temple, Arizona | 146691 | $468 |
| **Four** | February 6, 2019 | Company A, Temple, Arizona | 147366 | $313.20 |
| **Five** | January 28, 2019 | Company C, Joplin, Missouri | 147133 | $15,795.50 |
| **Six** | March 27, 2019 | Company D, Green Bay, Wisconsin | 147706 | $5,229 |

All in violation of Title 18, United States Code, Section 1343.

## COUNT SEVEN

16.     The allegations and assertions set forth in paragraphs 1 through 15 are incorporated by reference as though realleged and fully set forth herein.

17.     On or about December 19, 2018, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES W. LANTZMAN, did knowingly engage in a monetary transaction, affecting interstate commerce, in criminally derived property with a value greater than $10,000, which property was derived from specified unlawful activity, in that the defendant, CHARLES W. LANTZMAN, caused check #15054 from SIMCO PNC Bank account ending in 1013 in the amount of $16,667.11 to be paid towards First National Bank mortgage account ending in 4786 on a property in Pittsburgh, Pennsylvania, knowing that the funds were derived from a criminal offense, when in fact said funds were derived from wire fraud.

In violation of Title 18, United States Code, Section 1957(a).

## COUNT EIGHT

18.     The allegations and assertions set forth in paragraphs 1 through 15 are incorporated by reference as though realleged and fully set forth herein.

19.     On or about March 1, 2019, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES W. LANTZMAN, did knowingly engage in a monetary transaction, affecting interstate commerce, in criminally derived property with a value greater than $10,000, which property was derived from specified unlawful activity, in that the defendant, CHARLES W. LANTZMAN, caused check #15531 from SIMCO PNC account ending in 1013 in the amount of $14,567.08 to be paid towards First National Bank mortgage account ending in 4786 on a property in Pittsburgh, Pennsylvania, knowing that the funds were derived from a criminal offense, when in fact said funds were derived from wire fraud.

In violation of Title 18, United States Code, Section 1957(a).

## COUNT NINE

20.    The allegations and assertions set forth in paragraphs 1 through 15 are incorporated by reference as though realleged and fully set forth herein.

21.    On or about March 26, 2019, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES W. LANTZMAN, did knowingly engage in a monetary transaction, affecting interstate commerce, in criminally derived property with a value greater than $10,000, which property was derived from specified unlawful activity, in that the defendant, CHARLES W. LANTZMAN, caused check #15765 from SIMCO PNC account ending in 1013 in the amount of $244,745.34, payable to First National Bank, with note reading "Loan payoff–loan number [ending in] 8275" to be issued in order to pay off a loan associated with a property in Ventnor City, New Jersey, knowing that the funds were derived from a criminal offense, when in fact said funds were derived from wire fraud.

In violation of Title 18, United States Code, Section 1957(a).

9

## FORFEITURE ALLEGATIONS

1.      The Grand Jury realleges and incorporates by reference the allegations contained in Counts One through Nine of this Indictment for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c).

2.      The United States hereby gives notice to the defendant that, upon conviction of any of the offenses charged in Counts One through Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including, but not limited to:

Money Judgment

A sum of money in United States currency representing any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

3.      If any of the forfeitable property, as a result of any act or omission of the defendant:

    a)  cannot be located upon the exercise of due diligence;

    b)  has been transferred, sold to, or deposited with a third person;

    c)  has been placed beyond the jurisdiction of the Court;

    d)  has been substantially diminished in value; or

    e)  has been commingled with other property which cannot be subdivided without difficulty;

10

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

4.      The United States hereby gives notice to the defendant that, upon conviction of any of the offenses in Counts Seven through Nine, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1957, and all property traceable to such property, including, but not limited to:

Money Judgment

A sum of money in United States currency representing all property involved in such offenses or traceable to such property.

Real Property

The lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 207 Bailey Avenue, Pittsburgh, PA 15211.

The lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 5403 Winchester Avenue, Ventnor City, NJ 08406.

5.      If any of the forfeitable property, as a result of any act or omission of the defendant:

          a)  cannot be located upon the exercise of due diligence;

          b)  has been transferred, sold to, or deposited with a third person;

          c)  has been placed beyond the jurisdiction of the Court;

          d)  has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

A True Bill,

FOREPERSON

ERIC G. OLSHAN
United States Attorney
IL ID No. 6290382

JAMES R. WILSON
Assistant United States Attorney
PA ID No. 27648

WILLIAM B. GUAPPONE
Assistant United States Attorney
NC ID No. 46075

12