IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

CHARLES W. LANTZMAN,

*Defendant.*

Criminal No. 2:23-cr-251 - 1

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Defendant Charles W. Lantzman ("Lantzman") filed a Motion for a New Trial Pursuant to Fed. R. Crim. P. 33 (ECF No. 128) and a Motion for a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 (ECF No. 130). The United States of America ("the Government") filed an Omnibus Response to Defendant's Motion for a New Trial and Motion for a Judgment of Acquittal. (ECF No 141). For the following reasons, the Court will deny Lantzman's motions.

## I.   FACTUAL BACKGROUND

A federal grand jury indicted Lantzman on six counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts One through Six) and three counts of money laundering in violation of 18 U.S.C. § 1957(a) (Counts Seven through Nine). (ECF No. 4). Lantzman owns Snow and Ice Management Company of Pennsylvania ("SIMCO"), a snow and ice removal business. (ECF No. 3, p. 1). SIMCO contracted with hundreds of subcontractors, or service providers, to service approximately 800 customers in at least seven states. (*Id.* at 2). The service providers owned and operated their own trucks with snowplows and salting application equipment. (*Id.*). SIMCO contracted directly with customers who needed snow and ice removal services. (*Id.*). SIMCO relied on the service

1

providers to self-report the services they performed at each location to determine what services were provided to customers and what items of service to invoice the customers for receiving. (*Id.* at 3). Once the customer received the itemized invoice, the customer would either pay SIMCO electronically with a payment that went to SIMCO's business bank account or by sending a check to SIMCO through the United States Postal Service mail. (*Id.*). SIMCO paid the service providers based on the services that the providers reported that they performed. (*Id.* at 4). The amount paid to the service providers was less than the amount billed to the customers as SIMCO retained a portion of the fee. (*Id.*).

In the Indictment, the Government alleged that from in and around January 2017, and continuing until around April 2019, in the Western District of Pennsylvania and elsewhere, Lantzman engaged in a scheme to defraud to obtain money and property from SIMCO's customers by means of false and fraudulent pretenses, representations, and promises, knowing at the time that the pretenses, representations, and promises were false and fraudulent when made. (*Id.*). The Government alleged that Lantzman defrauded customers of SIMCO by "padding the customers' bills with charges for services that were never actually provided." (*Id.*). Lantzman allegedly added or caused to be added to customer invoices services that were never performed by the service providers. (*Id.*). The Government indicted Lantzman with six counts of wire fraud, contending that he transmitted the six specified fraudulent invoices via interstate wire. (*Id.* at 5-6).

The Government also indicted Lantzman with three counts of money laundering. (*Id.* at 7-9). These charges were based on allegations that Lantzman knowingly engaged in a monetary transaction, affecting interstate commerce in property with a value greater than $10,000 derived from his alleged wire fraud. (*Id.*). Specifically, these counts were based on Lantzman causing

checks from SIMCO bank accounts to be paid towards two mortgages knowing that the funds were derived from wire fraud. (*Id.*).

A jury trial was held on March 24, 2025, through April 3, 2025. (ECF Nos. 102-04, 106-07, 112, 119-21). The jury found Lantzman guilty of wire fraud at Counts One, Two, Four, Five, and Six and money laundering at Counts Seven, Eight, and Nine. (ECF No. 124). The jury found Lantzman not guilty of wire fraud charged at Count Three. (*Id.*). Lantzman now requests that the Court enter a judgment of acquittal on Counts One, Two, Four, Five, Six, Seven, Eight, and Nine (ECF No. 130) or, in the alternative, grant him a new trial (ECF No. 128).

## II.    STANDARD OF REVIEW

### A. Federal Rule of Criminal Procedure 29 – Motion for Judgment of Acquittal

A defendant may move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). Where "the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." FED. R. CRIM. P. 29(c)(2). In ruling on a motion for judgment of acquittal made pursuant to Rule 29, a district court must "'review the record in the light most favorable to the [Government] to determine whether any rational trier of fact could have found proof of [guilt] beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). A finding of insufficiency should be "confined to cases where the [Government's] failure is clear." *Smith*, 294 F.3d at 477 (citing *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Rule 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir. 1982); *United States v. Brodie*, 403 F.3d 123,133 (3d Cir. 2005). The United States Court of Appeals for the Third Circuit

has long advised that, in considering a post-verdict judgment of acquittal, a district court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)).

> Thus, even if the evidence adduced is consistent with multiple possibilities, our role as [the Court] is to uphold the jury verdict . . . as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury – not the district court . . . – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

*United States v. Caraballo-Rodriguez*, 726 F.3d 418, 433 (3d Cir. 2013) (internal quotation marks and citations omitted).

## B. Federal Rule of Criminal Procedure 33 – New Trial

A defendant may move for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33") which provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . ." FED. R. CRIM. P. 33(a). A defendant may move for a new trial based on the contention that the weight of the evidence does not support the jury's verdict. "[W]hen a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (internal quotation marks and citations omitted). Such motions are not favored and should be "granted

sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (internal citations omitted); *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008).

A defendant may also move for a new trial on the basis that trial errors tainted the jury's verdict. "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F. App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993)). Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

## III.    ANALYSIS

Lantzman moves for a judgment of acquittal on the basis that the evidence and testimony offered by the Government, even viewed in the light most favorable to the Government, was insufficient to sustain the convictions against him. (ECF No. 131, p. 3). Lantzman contends that the Government failed to present any evidence proving that the services in question were not rendered or that he acted with an intent to defraud. (*Id.*). He argues that the Government failed to prove that he acted to deprive his customers of money or property – an essential element of wire fraud. Further, Lantzman argues that since the money laundering charges were predicated on the wire fraud allegations, the jury's convictions at Counts Seven, Eight, and Nine cannot stand. (*Id.*). Lantzman alternatively argues that the Court should grant him a new trial because the jury's verdict

was contrary to the weight of the evidence and was substantially influenced by numerous trial errors. (ECF No. 129).

The Court will first address Lantzman's arguments relating to the sufficiency and weight of the evidence presented at trial. As discussed above, there are different standards of review with regard to a motion for a judgment of acquittal and a motion for a new trial. Since the Court holds that Lantzman falls short of both standards, it will collectively analyze the evidence supporting the jury's verdict. Second, it will address Lantzman's alleged trial errors.

## A. Wire Fraud Convictions (Counts One, Two, Four, Five, and Six)

Lantzman argues that the evidence was insufficient as to Counts One, Two, Four, Five and Six, in that it shows he acted in good faith and pursuant to industry standard practices when he conducted his billing review and revision process. (ECF No. 129, p. 3); (ECF No. 131, p. 14). He contends that SIMCO's process and adherence to industry standard practices negated any specific intent to defraud. (ECF No. 129, p. 3); (ECF No. 131, pp. 13-18). Lantzman also argues that the weight of the evidence demonstrates that each of the customers at issue received "the benefit of their bargain." (ECF No. 129, p. 2); (ECF No. 131, p. 4). He contends that the services the jury found were not rendered and were fraudulently added to invoices were actually performed. Hence, no customer was defrauded of money or property sufficient to sustain a conviction for wire fraud. (ECF No. 129, p. 3); (ECF No. 131, p. 4).

The elements necessary to establish a claim for wire fraud are: (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent. *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002).[1] Wire fraud also has an interstate

---

[1] Cases construing mail fraud are applicable to wire fraud because the mail and wire fraud statutes are identical except for the method used to disseminate the fraud. *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994).

commerce component that must be satisfied. 18 U.S.C. § 1343. "A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 614-15 (E.D. Pa. 2010).

      *1.  Deprivation of Money or Property Interests[2]*

      The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The "money or property" requirement limits the "scheme or artifice to defraud" element because the "common understanding" of the words "to defraud" when the statute was enacted referred "to wronging one in his property rights." *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (internal citations omitted). Accordingly, the Government had to prove not only that Lantzman "engaged in deception," but also that money or property was "an object of [his] fraud." *Id.* (internal citations omitted).[3] At trial, the Government presented evidence that services

---

[2] Lantzman repeatedly speculates that the jury likely found him not guilty at Count Three because he introduced evidence demonstrating that the location at issue in Count Three received the additional salt service that the Government claimed was never performed. (ECF No. 131, p. 4). Lantzman argues that since the Government's evidence for the other counts provided "equal or nearly equal circumstantial support" for its contention that the services at issue were never performed, the evidence was insufficient to sustain the jury's verdict at Counts One, Two, and Four through Six. (*Id.* at 4-5). The Court does not find this argument persuasive. The Government did not present testimony of the service provider who allegedly provided the services at issue in Count Three. While the Court cannot know the reason behind the jury's verdict, this is a reasonable explanation as to why the jury acquitted Lantzman at Count Three but convicted him at Counts One, Two, Four, Five, and Six.

[3] Lantzman states that 18 U.S.C. § 1343 requires "an actual deprivation of money or property." (ECF No. 142, p. 3). This an inaccurate statement of law. "The [G]overnment need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property." *United States v. Ames Sintering Co.*, 927 F.2d 232, 235 (6th Cir. 1990); *see also United States v. Porat*, 76 F.4th 213, 219 (3d Cir. 2023) ("[S]uccess of the scheme is not required to sustain a wire fraud conviction.").

were not performed sufficient to support the jury's verdict at Couns One, Two, Four, Five, and Six.

    a.  <u>Count One</u>

The jury found Lantzman guilty at Count One of wire fraud in relation to "salt lot" and "salt walk" services invoiced for a Carvana facility in Bridgeville, Pennsylvania, on November 16, 2018. (ECF No. 124); (ECF No. 134, pp. 104, 106). Lantzman contends that "[t]he evidence . . . showed that the service occurred – even if it was not clear years after the fact who performed it that morning." (ECF No. 131, p. 7). Lantzman highlights that the service provider testified that "just because he did not perform the salting service does not mean that it was not done by another service provider." (*Id.*); (ECF No. 134, p. 109). Lantzman speculates that Kevin Marchinsky ("Marchinsky"), a SIMCO operations manager, could have called another service provider if Matthew Clary ("Clary"), the testifying service provider, was unavailable. (ECF No. 131, p. 7); (ECF No. 134, p. 110). In the alternative, Marchinsky could have performed the service himself. (ECF No. 131, p. 7); (ECF No. 134, p. 111). Either way, Lantzman contends, "the service was provided." (ECF No. 131, p. 7).

Clary is the owner of MC Landscaping, a service provider for SIMCO. (ECF No. 134, p. 103). Clary testified that he did not record in CrewTracker[4] that he performed any services for SIMCO at the Carvana facility in Bridgeville on November 16, 2018. (ECF No. 134, p. 104). Clary testified that he always logged the services that he provided in CrewTracker to ensure that he was paid by SIMCO. (*Id.* at 104-05).

---

[4] CrewTracker was an application that SIMCO required its service providers to use to record which services it rendered to customers during a snow and ice event. (ECF No. 137, p. 11).

There was sufficient evidence for a jury to conclude that Clary did not provide the disputed services on November 16, 2018. Marchinsky *could* have called another service provider to perform the disputed services (or performed the services himself). However, the evidence presented at trial undermines this argument. Where a service provider was called to cover for another provider who did not perform his scheduled or contracted services, it was SIMCO's regular practice to fill out a billing adjustment form. (ECF No. 133, pp. 190-91). Billing adjustment forms were used to ensure that the covering service provider received payment from SIMCO for their services even if the services were not entered into CrewTracker. (*Id.*). Federal Bureau of Investigation ("FBI") Special Agent Samantha Bell ("Bell") testified that she reviewed SIMCO's billing records and did not find a billing adjustment form showing that another contractor reported performing "salt lot" or "salt walks" services at the facility at issue on November 16, 2018. (ECF No. 139, pp. 19-20).

The Government argues that Marchinsky's testimony belies any notion that he either performed the service himself or called another service provider to perform the disputed services. Marchinsky testified that part of his role with SIMCO was to review storm summary reports. (ECF No. 134, p. 164). Lantzman directed him to mark-up the reports with handwritten notes if anything on the report "didn't look normal, needed deleted, added, et cetera." (*Id.* at 165). Marchinsky would look at a weather report that reported the weather by zip code to determine what services "should" have been performed by a service provider. (*Id.*); (*see also id.* at 164 (stating that Marchinsky used "weather" to determine whether to add the salt lot and salt walk services)). Lantzman taught Marchinsky to "mark-up" storm summary reports in this manner. (*Id.*).

Lantzman contends that telephone records show that the service at issue was performed. (ECF No. 131, p. 6). Benjamin Portugal ("Portugal") is the chief executive officer ("CEO") of

Express Facilities Management ("Express"), the facilities management team at the location at issue in Count One. Portugal testified that if a snow and ice removal service needed to be performed, his employees were trained to contact SIMCO representatives to ensure that the services were rendered. (ECF No. 134, p. 43). Lantzman introduced telephone records to show that there were communications between Lantzman, an employee of Express, and Marchinsky on November 16, 2018. (*Id.* at 38-39). Lantzman contends that these communications showed that Express and SIMCO personnel were in contact on November 16, 2018, and that the communications stopped because the requested services were completed. (ECF No. 131, pp. 6-7). But, as the Government highlights, there was no information introduced at trial about the content of these communications. (ECF No. 141, p. 16).

The Court will not enter a judgment of acquittal at Count One. Even if the evidence is consistent with other possibilities, like Marchinsky or another service provider performing the services, the Court will not substitute its judgment for that of the jury's. As is evident by its verdict, the jury reasonably found that (1) Clary did not perform the service; (2) the absence of a billing adjustment form showed that another service provider or Marchinsky did not perform the service; and (3) the telephone calls between Express employees, Marchinsky, and Lantzman were irrelevant to whether the disputed services were performed. The jury determined that the "salt lot" and "salt walks" services charged at Count One were not performed. In other words, it found that the evidence proved the deprivation of money or property requirement of wire fraud.

Further, the Court will not grant Lantzman a new trial with regard to Count One. The Court does not find that the jury verdict is contrary to the weight of the evidence. It holds that no miscarriage of justice occurred. The evidence presented at trial allowed a reasonable juror to

determine, beyond a reasonable doubt, that Lantzman deprived his customer of $585 by billing it for "salt lot" and "salt walks" services that were not actually provided.

      b.  <u>Count Two</u>

At Count Two, the jury found Lantzman guilty of wire fraud in relation to a "de-ice lot" service invoiced to a YRC Freight facility on November 15, 2018. (ECF No. 124). Lantzman added a "de-ice lot" service allegedly rendered on November 15, 2018 at 10:00 p.m. at YRC Freight to the customer's invoice. Daniel Trupia ("Trupia"), SIMCO's service provider at YRC Freight (ECF No. 138, p. 100), did not log the de-icing service into CrewTracker. The Government argues that Trupia did not log the service on the application because it was not performed. It is undisputed that Trupia "de-iced" or salted the lots at YRC Freight once on November 15, 2018. The invoice to YRC Freight shows that two de-icing services were performed. Thus, the issue at trial was whether the second de-icing service was performed or whether it was fraudulently added to YRC Freight's invoice from SIMCO.

Trupia testified that service providers, including himself, were required to enter the services they performed into the CrewTracker application. (ECF No. 138, pp. 93-94). If a service provider failed to enter a service into CrewTracker, the service provider was to complete a missed services report to receive payment from SIMCO. (*Id.* at 94). Trupia kept track of the services he performed and compared those services to what was entered into CrewTracker to ensure that he was paid by SIMCO for every service he performed. (*Id.* at 95). Trupia had no records indicating that he performed the service at issue.

Lantzman argues that the testimony of Christopher Girardi ("Girardi"), SIMCO's operations manager for the territory covering YRC Freight, (ECF No. 133, pp. 42-43), highlighted the extensive review process Lantzman undertook to "ensure that customer bills accurately

reflected the services performed." (ECF No. 131, p. 7). He stresses the import of Girardi's testimony pertaining to Elsinore Plaza. Elsinore Plaza was another location SIMCO serviced within Girardi's territory. (ECF No. 133, p. 108). It was also serviced by Trupia. (*Id.* at 109). On November 15, 2018, Trupia logged that, at Elsinore Plaza, he de-iced the sidewalks, the lot, and the drive lanes. (*Id.*). Girardi noted that there was 3.7 inches of snow and a tenth of an inch of ice at both YRC Freight and Elsinore Plaza on November 15, 2018. (*Id.* at 110). Girardi testified that under those conditions, service providers should generally provide salting. (*Id.* at 96). Trupia salted Elsinore Plaza that evening. (*Id.* at 109). Lantzman argues that evidence that Elsinore Plaza and YRC Freight had similar weather conditions on November 15, 2018, and that Elsinore Plaza was salted shows that the salting services were performed at YRC Freight – even though CrewTracker does not reflect these services. Lantzman contends that Trupia "confirmed during testimony that he provided the de-icing service at YRC Freight on November 15, 2018." (ECF No. 131, p. 8). During cross-examination, Lantzman presented Trupia with the invoice SIMCO sent YRC Freight listing the services Trupia provided on November 15, 2018. (ECF No. 138, p. 118). Relying on the document, Trupia testified that he performed the services billed to the customer. (*Id.* at 119). Trupia later testified during re-direct examination that he only performed one "de-icing" service to the lot at YRC Freight as reflected in CrewTracker. (*Id.* at 122).

Lantzman contends that an email exchange between Trupia and Girardi confirmed that Trupia de-iced the YRC Freight lot. (ECF No. 131, p. 8).

From: Chris Girardi
Sent: Friday, November 16, 2018 9:15 AM
To: dan@advantagelawnandlandscaping.com
Subject: Crew Tracker Follow up

Dan,

I received your invoice for the Drive Time, thank you.

Just confirming what I see in CT this morning
Elsinore Plaza – No plowing was performed yesterday?
YRC Freight - No plowing was performed yesterday?

I see Walks Cleared and Lots De-Iced only for both props.

From: Daniel Trupia <dan@advantagelawnandlandscaping.com>
Sent: Friday, November 16, 2018 1:53 PM
To: Chris Girardi <chris@snowandicemgmt.com>
Subject: Re: Crew Tracker Follow up

Correct, no plow

(*Id.* at 9). The Court does not view these emails as dispositive to whether the de-icing or salting services at issue were performed. As stated above, the Government concedes that Trupia de-iced YRC Freight's lots once. (ECF No. 141, p. 17). The issue is whether the *second* charged de-icing service was fraudulent. This email exchange does not shed any light on whether Trupia de-iced YRC Freight's lots once or twice on November 15, 2018.

Finally, Lantzman contends that Herman Braxton's ("Braxton"), a YRC Freight employee, (ECF No. 134, p. 47), testimony corroborates that YRC Freight received the second de-icing service because there is no evidence that Braxton contacted SIMCO to confirm or draw attention to the service as he did on other occasions. (ECF No. 131, p. 9). Braxton testified that he did not personally keep track of what services SIMCO's service providers did or did not perform at YRC Freight. (ECF No. 134, p. 50). He relied "on the integrity of the vendor." (*Id.*); (*see id.* at 51 (stating that YRC Freight trusted that SIMCO's invoices were accurate)).

The Court will not enter a judgment of acquittal as to Count Two. The jury reasonably found, based on Trupia's testimony and the CrewTracker data, that SIMCO did not perform the second de-icing service at YRC Freight on November 15, 2018. Thus, the jury determined that Lantzman defrauded YRC Freight of the money used to pay for this service. In accordance with Rule 29, the Court will not substitute its judgment for that of the jury's.

Further, the Court will not grant Lantzman a new trial on Count Two. The Court does not find that the jury's verdict was contrary to the weight of the evidence presented at trial. Girardi's testimony that 3.7 inches of snow and one-tenth of an inch of ice generally requires salting does not establish that Trupia performed two de-icing services at YRC Freight. While Trupia provided somewhat conflicting testimony regarding whether he performed the service, this inconsistency does not create a serious danger that a miscarriage of justice occurred. A reasonable jury could have found that the second de-icing at YRC Freight on November 15, 2018, did not occur and that Lantzman's invoice billing YRC Freight for this service sought to deprive YRC Freight of money.

    c.  <u>Count Four</u>

At Count Four, the jury convicted Lantzman of fraudulently billing for "salt lot" and "salt walks" services at Express DriveTime Cleveland ("Express") on January 17, 2019, that were never performed. (ECF No. 124). SIMCO invoiced Express for this service, but the service provider did not make an entry in CrewTracker for either "salt lot" or "salt walks" on January 17, 2019. (Gov. Exhibit 4). The service provider testified that if he provided the service, it would have been logged in the application. (ECF No. 134, p. 92). Portugal, the CEO of Express, testified that Express hired SIMCO to provide snow and ice removal services at DriveTime. (*Id.* at 9). He acknowledged that he had no independent knowledge as to whether SIMCO service providers actually performed the invoiced services. (*Id.* at 11-12). Portugal trusted that the invoices from SIMCO were accurate. (*Id.*).

Lantzman relies on testimony and call records to establish that Express called SIMCO to service DriveTime that afternoon. (ECF No. 131, p. 9). During snow and ice events, customers would call SIMCO to request services. (ECF No. 134, p. 146). SIMCO would then call or text the service provider to let them know that the location needed serviced. (*Id.*). SIMCO would

follow-up with the service provider until they received confirmation that the service was performed, or the service was logged in CrewTracker. (*Id*.). Calls were logged on a call log sheet. (*Id*. at 147). Portugal testified that Express employees were trained to contact SIMCO if they believed that a service needed to be performed. (*Id*. at 43). Telephone records show that Express employees contacted SIMCO on January 17, 2019, at 3:38 p.m. (*Id*. at 33). The service provider performed services to a location close to DriveTime at 4:45 p.m. (*Id*. at 101). He testified that it is possible that between Express's call to SIMCO at 3:38 p.m. and his service of another location at 4:45 p.m., that he provided services to DriveTime. (*Id*. at 102). The service time for the disputed "salt lot" and "salt walks" time was listed as 4:00 a.m. (*Id*. at 101). Lantzman's theory is that the notation represented a typo – the actual time was 4:00 p.m. (ECF No. 129, p. 9).[5]

Lantzman argues that since the communications between the service provider, SIMCO, and Express ceased after the 3:38 p.m. telephone call, the service must have been performed – especially in light of SIMCO's practice to continue to contact service providers until the service was confirmed. However, a SIMCO employee testified, specifically as to this service, that she may not have received confirmation from the service provider before she left the office for the day. (*Id*. at 151).

A jury could have believed Lantzman's interpretation of the evidence and viewed the cessation of telephone calls between Express and SIMCO as circumstantial evidence that the service was provided to DriveTime, but the jury did not in this case as it was not the only reasonable conclusion from the evidence. The call sheets Lantzman relied on did not contain any

---

[5] Lantzman contends that "the Government convicted . . . Lantzman [] because the service time was listed as 4:00 a.m. But that was a simple typo . . . ." (ECF No. 129, p. 10). First, the Court notes that the Government *prosecuted* Lantzman. The *jury* convicted Lantzman. Second, as discussed in detail below, the time of the service is not the only reasonable reason for the jury to find that the service was not performed.

information about whether a service was actually performed. (*Id.* at 161). If the service was completed, it likely would have been logged in CrewTracker. (*Id.* at 161-62). It was not. Further, if SIMCO received confirmation from the service provider that the service was performed, they would have listed a "time-out" time on the call sheet. (*Id.* at 162). There was no "time-out" time listed on the call sheet at issue. Presumably, the jury inferred that, given the time of day, SIMCO never received confirmation from the service provider that the service was performed. Communication between SIMCO and the service provider ceased because it was the end of the business day and SIMCO's employees left the office– not because the service was performed.

The Court will not enter a judgment of acquittal with regards to Count Four. The evidence as to Court Four may support multiple possibilities. The Court will not usurp the role of the jury simply because another explanation for the evidence is possible. By virtue of its verdict, the jury believed that the service at DriveTime on January 17, 2019, at 4:00 a.m. was not provided, and that Lantzman fraudulently billed Express for the service. Moreover, the Court will not grant Lantzman a new trial with regards to Count Four. The verdict is not contrary to the weight of the evidence nor is there a serious danger that a miscarriage of justice occurred.

### d. Count Five

Count Five relates to an invoice emailed to Tamko Building Products ("Tamko") for a second shovel sidewalk service and a second salt lot charge on January 13, 2019. The service provider for Tamko, Randolph Oliver Shores ("Shores"), testified that if he performed a service, he either logged the service into CrewTracker or completed a missed service form with SIMCO. (ECF No. 138, pp. 37-38). Shores personally tracked that all of his services were reported to SIMCO to ensure that he was paid for his work. (*Id.* at 38-39). On January 13, 2019, internal SIMCO documents showed that Shore cleared the sidewalks, plowed, and salted the sidewalks at

Tamko. (*Id.* at 41-42). He testified that he did not resalt the lots or clear the sidewalks a second time that day because he did not have authorization to do so. (*Id.* at 42). The second salting and clearing was not recorded in CrewTracker or documented by a missed services form. (*Id.* at 43). Shores testified that if he performed the disputed services, they would have been documented. (*Id.*).

Lantzman highlights that the maintenance manager for Tamko, Jeffery Horst ("Horst"), testified that he had no reason to believe that SIMCO or its service providers failed to perform snow and ice removal services on January 13, 2019. (ECF No. 134, p. 75). Horst regularly reviewed and approved the snow removal services provided at Tamko. (*Id.* at 69). If snow and ice removal services were not conducted properly, Horst testified that he would have reached out to SIMCO to alert them of issues that needed addressed. (*Id.* at 69-70).

Horst's testimony is not as definitive as Lantzman asserts. Horst testified that he had no independent knowledge as to whether SIMCO service providers actually performed the individual line-item services listed on the invoice. (*Id.* at 67); (*id.* at 73 ("I did not have firsthand knowledge to know if . . . every individual application of salt or every . . . round of plowing was completed.")). Moreover, Horst testified that in the middle of a snowstorm, Tamko halted operations until snow and ice removal was complete. (*Id.* at 72). Horst did not have knowledge of how many individual services SIMCO's service providers provided during a winter weather event. (*Id.*).

Lantzman's argument rests on the premise that Horst did not complain that services were not performed. Thus, the services must have been performed. The issue with this theory is that it requires a jury to believe that a facilities manager of a large property kept track of exactly how many times the lots and sidewalks were cleared during each snowstorm. Here, the jury presumably

reasonably inferred from Horst's testimony that he focused on whether the snow and ice was clear as a whole throughout the facility – not whether SIMCO salted the lots and walks once or twice.

Lantzman also appears to be arguing that if snow and ice were removed from Tamko, the facility "received the benefit of the bargain." (ECF No. 129, p. 11 ("Tamko paid for a clear sidewalk and clear lot, which it received.")). The issue is that Tamko did not pay one overarching fee for snow and ice removal. SIMCO billed via individual line items. If SIMCO billed Tamko for two services that it did not perform, Tamko was deprived of the money that it paid for these services, regardless of whether, as a whole, its lots and walks were cleared of snow and ice. (*See id.* at 43 (stating that the service provider could have made another "thousand-plus" dollars if he salted the Tamko lot a second time on January 13, 2019)).

The Court will not enter a judgment of acquittal with regards to Count Five. The jury's conclusion that Lantzman deprived Tamko of money by billing it for two services that SIMCO's service provider did not perform is reasonable and rational in light of the evidence presented. Moreover, the Court will not grant Lantzman a new trial with regards to Count Five. The jury's verdict is not contrary to the weight of the evidence and there is no danger that a miscarriage of justice occurred.

### e.  Count Six

At Count Six, the jury convicted Lantzman of fraudulently adding a "salt lot" service at 9:49 p.m. on January 17, 2019, at Schneider-Carlisle. The service provider for that location, Matthew Norman Waltz ("Waltz"), logged into CrewTracker that he de-iced the lot once, de-iced the sidewalks once, and de-iced the road twice. (Gov. Exhibit 6). The invoice sent to Schneider-Carlisle billed the customer for a second de-ice service that was not listed in CrewTracker. (Gov. Exhibit 6B). Waltz testified that he always used the CrewTracker application. (ECF No. 133, p.

130). Waltz also maintained a log in a notebook of the services that he performed. (*Id.* at 131). At the end of a snow and ice event, Waltz would cross-reference his notebook to the CrewTracker records to ensure that all the services he performed were accounted for with SIMCO. (*Id.* at 131-32). Then, when Waltz was paid, he would cross reference the records again to ensure that he was paid for all the services that he performed. (*Id.* at 132). He did not recall a time when he was not paid for a service that he performed. (*Id.*). Waltz testified that he did not report a second salting service at Schneider-Carlisle on January 17, 2019, because he "didn't do it" and thus "wouldn't need to get paid for it." (*Id.* at 138-39).

Lantzman highlights that global positioning software ("GPS") coordinates show that Waltz was in the Schneider-Carlisle parking lot when the disputed service was allegedly performed. (*Id.* at 169). Waltz also testified that, although he does not believe he would have failed to input a service into CrewTracker, "it's possible." (*Id.* at 166). Further, Donald Brown ("Brown"), the facilities manager at Schneider-Carlisle, testified that if he noticed an error on an invoice from SIMCO, nothing prevented him from bringing the error to SIMCO's attention. (*Id.* at 86). The Government did not present evidence that Brown contacted SIMCO regarding an error in the invoicing to Schneider-Carlisle.

The Court holds that the jury reasonably found that Schneider-Carlisle never received the second "salt lot" service. From the GPS data, the jury *could* infer that Waltz performed the salting service, but this is not the only conclusion to be drawn from this evidence. The GPS data showing Waltz in the Schneider-Carlisle parking lot around the time of the at-issue service does not conclusively demonstrate that he performed the service. Waltz was adamant that if he performed the service, it would have been recorded in CrewTracker. He testified that it was possible that he missed logging the service, but not likely. Moreover, the lack of customer complaints is not direct

evidence that the service was performed. As discussed above, the jury could reasonably conclude that facilities managers at large locations were most concerned with whether their properties were clear of snow and ice – not whether individual line items were performed – especially when the service at issue was logged as occurring overnight.

The Court will not enter a judgment of acquittal or grant a new trial with regard to Count Six. The jury reasonably concluded that Lantzman billed Schneider-Carlisle for a service that was not performed, and the evidence supports its verdict. Waltz was adamant that there was no record of the service being performed beyond SIMCO's invoice to Schneider-Carlisle because he did not perform one. Evidence that Waltz was in the lot when the service was performed, and that Brown did not complain regarding invoice errors to SIMCO, is consistent with possibilities other than the service being performed. Thus, the Court will not enter a judgment of acquittal. The Court will not grant a new trial because there is no danger that a miscarriage of justice occurred.

### 2. *Specific Intent to Defraud*

Lantzman argues that the Government's evidence as to Counts One, Two, Four, Five, and Six was "deficient in another critical respect: the weight of the evidence showed that . . . Lantzman did not act with the specific intent to defraud. . . ." (ECF No. 129, p. 14). He argues that the Government did not prove beyond a reasonable doubt that he knew the at-issue services were not performed because he merely transposed notes from SIMCO employees on storm summary reports. (*Id.* at 14-15). According to Lantzman, expert testimony established that his billing review process and his reliance on information sources, including SIMCO's operations managers' notes, were consistent with industry standard practices. (*Id.* at 15). The Government counters that Lantzman directed his employees to add services to invoices that were not performed, added services to customers' invoices based on weather reports without any regard for whether those

services were actually provided, and that expert testimony was not probative as the expert witnesses had no first-hand knowledge of SIMCO's operations. (ECF No. 141, pp. 7-11). The Court holds, as will be discussed, that the Government presented sufficient evidence to prove beyond a reasonable doubt that Lantzman acted with the specific intent to defraud his customers.

To establish fraudulent intent necessary for wire fraud, the Government must establish that Lantzman acted with the specific intent to defraud. *See United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005). Specific intent "may be found from a material misstatement of fact made with reckless disregard for the truth." *Care One Mgmt. LLC v. United Healthcare Workers E.*, 43 F.4th 126, 137 (3d Cir. 2022); *see also United States v. Cen–Card Agency/C.C.A.C.*, 724 F. Supp. 313, 316–17 (D.N.J. 1989) (requiring the Government to prove that the defendants had a specific intent to defraud or that they "made material misrepresentations of fact with reckless disregard to their truth or falsity"); *United States v. Sheiner*, 273 F. Supp. 977, 982 (D.C.N.Y. 1967) (holding that wire fraud is broad in its scope and may ordinarily be shown by proof of intentional devising of scheme to defraud and use of wire communications in furtherance of scheme).

a. Transmittal of Notes from SIMCO's Operations Managers

Lantzman argues that the evidence adduced at trial showed that SIMCO's operations managers marked-up storm summary reports with comments and recommendations for his review. (ECF No. 129, p. 17). The evidence showed that he used the operations managers' notations of additional services performed to add charges to customer invoices. (*Id.* at 18). Lantzman contends that he could not have the intent to defraud his customers because the Government failed to demonstrate at trial that he knew the services were not actually performed. According to Lantzman, nothing presented by the Government called into doubt his good-faith reliance on the notes from the operations managers. Specifically, Lantzman contends that 317 out of more than

3,900 entries of the Government's summary exhibit, Government Exhibit 48, were instances where he merely used the notes of his employees. (*Id.*).

The Court holds that the evidence presented at trial undermines Lantzman's contention that he acted in good faith, believing that the services were actually performed, when he relied on operations managers' notes. Girardi, a SIMCO operations manager, testified that Lantzman instructed him to add services to storm summary reports that were not completed. (ECF No. 133, p. 60 ("Q. Were you ever instructed to add services to the storm summary reports that were not completed? A. So we were told if . . .the lot was plowed and there was no salting afterwards, we were to add that services and write, Pay SIMCO. Q. Irrespective of whether or not you knew that that lot was, in fact, plowed?  A. Correct.")). Girardi understood that when he added services in this manner, SIMCO was not paying the service provider but was still charging the customer for the service. (*Id.*). Girardi testified that he thought this practice was "unethical." (*Id.* at 61). Additionally, Gregory Waters ("Waters"), a former SIMCO sales and operations manager, testified that Lantzman asked operations managers to add shovel services to customer invoices, even when the services were not performed. (ECF No. 138, p. 131-32 (discussing an email instructing operations managers to add shoveling services even when the service providers cleared properties using only salt to "not lose that money as a company")).

From this evidence, the jury reasonably concluded that Lantzman's use of the notes from his operations managers to add charges to invoices did not indicate that he was acting in good faith. Since Lantzman trained his employees to add services that were not provided to storm summary reports, as the above testimony indicates, the jury did not err in finding that Lantzman acted with the specific intent to defraud by billing customers for services with, at minimum,

reckless disregard for whether the services were actually performed. *See Care One Mgmt.*, 43 F.4th at 137.

      b.  <u>Reliance on Industry Standard Practices</u>

Next, Lantzman argues that he relied on information and considerations on which a typical aggregator in the snow and ice removal industry would rely. (ECF No. 129, p. 15). Lantzman points to the testimony of John A. Allin ("Allin"), a shareholder involved in the development of the CrewTracker application. (*Id.*; *see also* ECF No. 139, p. 189). Allin testified that CrewTracker is a "tool" and not the "end-all and be-all" because it still requires service providers to input data. (*Id.* at 190). There may be mistakes regarding data entered into CrewTracker. (*Id.*). Allin testified that he recommends that aggregators rely on CrewTracker, weather, experience with the service provider, and operations managers in the billing review process. (*Id.* at 193-95). Lantzman highlights that Allin testified that aggregators who engaged in a billing review process do not do so with an intent to defraud customers. (*Id.* at 201). Instead, they do so to accurately capture the snow and ice removal services provided to the customer. (*Id.*).

Lantzman also relies on the testimony of Phillip Harwood ("Harwood"), a management consultant in the snow and ice removal industry. (ECF No. 129, pp. 16-17). Harwood conducted a survey of fifty companies in the snow and ice removal industry for purposes of his testimony. (ECF No. 135, pp. 120, 124). The survey included three questions: (1) "Do you invoice clients without first receiving invoices from subcontractors?"; (2) Do you correct information from subcontractors who use software applications if the information is missing or obviously wrong?"; and (3) "What percentage of information from applications is missing or wrong for a typical snow or ice event?" (*Id.* at 125). Eighty percent of companies responded that they invoice clients without receiving invoices from subcontractors. (*Id.* at 136). Eighty percent of companies

responded that they correct information from subcontractors who use applications if the information is missing or obviously wrong. (*Id.* at 137). In response to question three, asking what percent of information from applications is missing or wrong from applications, more than fifty percent of the companies reported an error rate of over ten percent, thirty-four percent of companies indicated that the error rate was twenty percent or more, ten percent reported that the error rate was fifty percent or more, and one company reported a ninety-seven percent error rate. (*Id.* at 138).

Lantzman contends that Harwood's survey established that it was reasonable for SIMCO to engage in a billing review process modifying services that were logged in CrewTracker. The Government counters that the trial evidence shows that Lantzman relied on zip-code wide weather reports in determining which services to add to a storm summary report. (ECF No. 138, pp. 135-36); (ECF No. 134, pp. 165-66). Weather reports do not show whether a service provider rendered a specific service. Since snow does not fall, stick, or melt evenly across an entire zip code, these reports are not a reliable way to determine whether services were provided identically throughout a zip code. (ECF No. 133, p. 57). The Government argues that it is not reasonable to rely on zip code weather reports to determine whether a service was performed without acting to verify the services through another source. It notes that Girardi testified that, to his knowledge, Lantzman did not verify that specific services were performed through service providers. (*Id.* at 58). Nor did Lantzman ask his operations managers to verify the at-issue services through the service providers. (*Id.*).

The Government's theory of the case was not that Lantzman's revision of invoices, standing alone, constituted fraud. Instead, the Government alleged, and the jury found at Counts One, Two, Four, Five, and Six, that Lantzman revised invoices not to ensure that they were

accurate, but to fraudulently add services that were not provided to the customer. In other words, he "padded" certain invoices to defraud his customers of money. There is no dispute: it is industry practice in the snow and ice removal business to consider information from multiple sources during a billing review process to capture the services provided to the customer. Further, CrewTracker may have included errors – included missed services. Nevertheless, there was no testimony that it was industry practice to bill customers for services that service providers did not perform – nor could there be since this practice constitutes fraud. Specific intent to defraud is not disproved by industry practice evidence. The evidence produced at trial allowed the jury to reasonably infer that Lantzman added services to customer invoices with at least reckless disregard for whether those services were rendered. There was sufficient evidence to support a finding by the jury that Lantzman acted with specific intent to defraud customers.

      c.   <u>Testimony from the Certified Fraud Examiner</u>

Lantzman called Aaryn Hogue ("Hogue"), a certified public accountant, financial forensic, and fraud examiner, to testify. (ECF No. 135, p. 37). In preparation for her trial testimony, Hogue reviewed CrewTracker data, storm summary reports, QuickBooks data, customer invoices, vendor pay sheets, Government Exhibits 48, 49, 51, 52, and 53, and other relevant documents. (*Id.* at 42). Hogue testified that SIMCO's business processes were inconsistent with a scheme to defraud. (*Id.* at 45). First, she reasoned that the presence of downward billing adjustments in the form of discounts and deletions outweighing upward billing adjustments was inconsistent with a scheme to defraud. (*Id.*). Second, Hogue testified that the upward adjustments that were allegedly fraudulent represented "a very, very small percentage of SIMCO's overall revenues and business in general." (*Id.*). Third, Hogue's review of SIMCO's business records showed that the service providers' proficiency with CrewTracker had a "direct and observable" impact on the number of

upward adjustments. (*Id*.). Finally, Hogue highlighted that administrative upward billing adjustments decreased between winter seasons – presumably as service providers became more adept at entering their services into CrewTracker. (*Id*.).

Lantzman argues that his lack of intent to defraud is evident from Hogue's testimony. (ECF No. 129, p. 18). He relies on Hogue's testimony that the business and billing processes at SIMCO were not consistent with a scheme to defraud. (*Id*.). He contends that the weight of the evidence does not support a finding that he acted with the specific intent to defraud. (*Id*.). The Government argued, both in its closing argument and in post-trial briefing, that the basis for Hogue's opinions were flawed. (ECF No. 140, p. 23); (ECF No. 141, p. 12). It takes issue with Hogue's opinion that the downward billing adjustments outweighed the alleged fraudulent upward billing adjustments. (*Id*.).

The Court holds that even if it is true that the downward adjustments outnumbered the upward adjustments, none of Hogue's opinions conclusively show that Lantzman lacked the intent to defraud his customers. Even if Lantzman gave downward billing adjustments and discounts (and even if the added fraudulent services represented a small portion of his business), the jury reasonably found that Lantzman committed wire fraud when he added, or directed to be added, services to customer invoices that were not performed.

Finally, Hogue's testimony that the identity of the service providers impacted the volume of allegedly fraudulent services and that the number of added services decreased over time is not dispositive. Hogue had no firsthand knowledge as to why the services fluctuated based on the identity of the service provider or why the added services decreased with each winter season. Hogue also had no firsthand knowledge as to whether the at-issue services were actually performed. While a factfinder could have concluded that this decrease occurred because service

providers were becoming more proficient with CrewTracker, thus fewer manual adjustments were needed, the jury seemingly concluded, as the Government argues, that the added services decreased because Elizabeth Kelly ("Kelly"), a former office administrator for SIMCO, stopped adding services to invoices in 2018. (*See* ECF No. 137, pp. 135-36).

After reviewing the record in the light most favorable to the Government, the Court holds that it presented sufficient evidence for the jury to find, beyond a reasonable doubt, that Lantzman acted with the intent to defraud his customers when he added services to invoices with, at the very least, reckless disregard for whether the services were performed. The testimony from Allin, Harwood, and Hogue, while relevant, was not dispositive as to whether Lantzman acted with the specific intent to defraud. The Court will not substitute its judgment for that of the jury's and it declines to enter a judgment of acquittal as to Counts One, Two, Four, Five, and Six.

The Court will not grant Lantzman a new trial on the wire fraud convictions. The verdict was not contrary to the weight of evidence. Sufficient evidence existed for the jury to find that Lantzman acted with the intent to defraud, regardless of the expert testimony. There is no serious danger that a miscarriage of justice occurred.

## B. Money Laundering Convictions (Counts Seven through Nine)

Lantzman did not request a new trial with regards to the money laundering convictions in violation of 18 U.S.C. § 1957(a) (Counts Seven through Nine). (*See* ECF No. 129). He only requested that the Court enter a judgment of acquittal with regards to these counts. (ECF No. 131). It is his position that since the Government failed to prove the wire fraud allegations beyond a reasonable doubt, the Court should grant a judgment of acquittal on Counts Seven through Nine as these charges were predicated on the underlying allegations of wire fraud.

To establish a violation of 18 U.S.C. § 1957, the Government must prove that (1) the defendant engaged or attempted to engage in a monetary transaction with a value of more than $10,000; (2) the defendant knew that the property involved in the transaction had been derived from some form of criminal activity; and (3) the property involved in the transaction was actually derived from specified unlawful activity. 18 U.S.C. § 1957(a); *see also United States v. Carucci*, 364 F.3d 339, 343 (1st Cir. 2004). Subsection (c) of the statute provides: "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957. In other words, a defendant may not be convicted under § 1957(a) unless he knew that the transaction involved "criminally derived property," but he need not know that the property was derived from the "specified unlawful activity." *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) (quoting *United States v. Gabriele*, 63 F.3d 61, 65 (1st Cir.1995)).

In light of the Court's holding that the Government provided sufficient evidence for a jury to find Lantzman guilty beyond a reasonable doubt of Counts One, Two, Four, Five and Six, and because the Government produced sufficient evidence to prove the other elements of 18 U.S.C. § 1957(a), the Court will deny Lantzman's motion for a judgment of acquittal with regards to Counts Seven through Nine.

### C. Alleged Errors at Trial

Lantzman requests a new trial on the wire fraud counts (Counts One, Two, Four, Five, and Six) because "numerous trial errors, individually and collectively, substantially influenced the jury's verdict." (ECF No. 129, p. 3). Lantzman argues that (1) evidence improperly admitted under Federal Rule of Evidence 404(b) ("Rule 404(b)") prejudiced the defense; (2) the Government unconstitutionally shifted the burden of proof onto Lantzman; (3) the Government

improperly suggested that the service providers were the victims of the alleged fraudulent scheme; and (4) Government Exhibit 48 was inadmissible. (*Id.* at 19-26). For the following reasons, the Court holds that there were no errors at trial and, even if there were, Lantzman failed to demonstrate prejudice. None of the purported errors, even if combined, could have infected the jury's deliberations so as to have substantially influenced the outcome of the trial.

*1. Intrinsic Evidence and Evidence Admitted Pursuant to Rule 404(b)*

Lantzman argues that the Government prejudiced his defense by introducing Rule 404(b) evidence, without reasonable notice, "which had no probative value and was unduly prejudicial." (ECF No. 129, p. 19). Lantzman specifically takes issue with the admission of Brian Patter's ("Patter") testimony regarding Lantzman's participation in a similar scheme to defraud at a New Jersey-based terminal, the admission of two customer complaints, and Waters' testimony regarding services that occurred in Toano, Virginia. (*Id.* at 19-23). The Court holds that this evidence was admissible pursuant to the Federal Rules of Evidence. It will individually address each piece of evidence.

Intrinsic evidence is not subject to Rule 404(b). *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010) (noting that there is "no 'other' wrongful conduct at issue [with intrinsic evidence]; [rather,] the [intrinsic] evidence is admissible as part and parcel of the charged offense"). The Third Circuit has classified two types of evidence as intrinsic: (1) evidence that "directly proves" the charged offense; and (2) "uncharged acts performed contemporaneously with the charged crime . . . if they facilitate commission of the charged crime." *Id.* at 248–49 (internal citations and quotation marks omitted). Such evidence may also be properly admitted when it "completes the story" of the charged offense or provides "necessary background information." *Id.* at 249–50. The Third Circuit explains that, in fraud cases, "[o]nce certain fraudulent conduct is properly included

as part of the charged scheme, Rule 404(b) poses no obstacle because the evidence that is part of the charged crime does not fall under Rule 404(b)." *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002). In particular, courts recognize that "[p]roving specific intent in [] fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent." *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994).

While the Government is required to provide reasonable notice of any evidence it intends to offer at trial under Rule 404(b), intrinsic evidence is not subject to Rule 404(b) or its notice requirements. *See United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (rejecting the defendants' argument that the prosecution failed to supply adequate notice under Rule 404(b) because the evidence at issue was intrinsic and, therefore, not subject to Rule 404(b)); *see also Green*, 617 F.3d at 247 ("[T]he only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request." (internal quotation marks omitted)).

In *United States v. Evans*, 571 F. Supp. 3d 368 (M.D. Pa. 2021), *aff'd*, 2025 WL 471106 (3d Cir. Feb. 12, 2025), the defendant was charged with, in part, seven counts of wire fraud. The Government sought to introduce into evidence other uncharged acts of fraud which it asserted demonstrated an "overall scheme to defraud" that led to the charged wire fraud offenses. *Id.* at 372. The district court found that the other fraudulent acts were intrinsic, and not within the ambit of Rule 404(b), because the proffered evidence went to the heart of the scheme. It "demonstrate[d] an unbroken series of fraudulent acts" that led up to the charged offenses. *Id.* The evidence was relevant to show that the defendant's "scheme to defraud was not an isolated event . . . it [was]

multi-faceted, it all [fell] under the umbrella of a general scheme to defraud the same entities over time." *Id.* at 374.

On the other hand, Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). However, such acts may be introduced if presented for another purpose, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or lack of accident." *Id.* Accordingly, under Rule 404(b), prior act evidence is inadmissible unless the evidence is (1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested. *United States v. Caldwell*, 760 F.3d 267, 277-78 (3d Cir. 2014). Rule 404(b) is characterized as a "rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted." *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017) (internal quotation marks and citations omitted).

The Third Circuit has routinely upheld the admissibility of related, uncharged fraudulent conduct under Rule 404(b). *See United States v. Saada*, 212 F.3d 210, 223-24 (3d Cir. 2000); *see also United States v. Kellogg*, 510 F.3d 188, 201 (3d Cir. 2007). It is well-established that "evidence of one alleged fraudulent scheme may be admissible under Rule 404(b) as relevant evidence of [the] [d]efendant's motive, opportunity, intent, absence of mistake, or the lack of accident when committing another alleged fraudulent scheme." *United States v. Hartley*, No. 3:20-CR-269, 2022 WL 1019225, at *7 (M.D. Pa. Apr. 5, 2022); *see also United States v. Jemal*, 26

F.3d 1267, 1276 (3d Cir. 1994) (holding that evidence that the defendant participated in prior scheme to defraud creditors is "highly relevant" to show knowledge and intent and is admissible under Rule 404(b) in a prosecution for a similar scheme).

Further, courts outside the Third Circuit similarly recognize that "extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997) (citing *Huddleston v. United States*, 485 U.S. 681, 685 (1988)). As the United States Court of Appeals for the Fourth Circuit explained in *Queen*, once an act is done, "the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done with innocent intent." *Id.* (internal citations omitted). Similarity of acts may be demonstrated through a defendant's "indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses." *Id.* (citing *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)). The more similar the act, the more relevant the act in establishing a defendant's intent and the less danger that a defendant will be convicted for bad character. *See id.*; *see also United States v. Scott*, 701 F.2d 1340 (11th Cir. 1983) (holding that evidence of similar false credit applications made one year earlier was "highly relevant" to the issue of intent on alleged false loan applications). Additionally, the Government may use evidence of similar prior bad acts to prove knowledge and intent – especially when there is no doubt that the issues of knowledge and intent will be in dispute. *See United States v. Bok*, 156 F.2d 157, 166 (2d Cir. 1998) (holding that similar act evidence was admissible in the Government's case-in-chief since it was apparent that the defendant planned to contest the issue of intent).

a.  Patter's Testimony

On March 10, 2025, the Government filed a notice pursuant to Rule 404(b) stating that it intended to admit SIMCO employee testimony that, prior to the time period charged in the indictment, Lantzman added "fictitious" charges to customer invoices for snow removal services that were never performed. (ECF No. 80). The Government argued that the evidence at issue was intrinsic and, in the alternative, admissible under Rule 404(b) because it was probative to Lantzman's intent. (*Id*.). The Government outlined that Patter, a former SIMCO operations manager, would testify that he witnessed Lantzman adding services to customer invoices (both in and outside of Pittsburgh, Pennsylvania) by way of handwritten notations reading: "add salt, pay SIMCO." (ECF No. 80, p. 4). Patter was expected to testify that SIMCO's subcontractors did not actually perform the services for which Lantzman billed, and that Lantzman knew such services were not performed. (*Id*.). Patter was also expected to testify that, in his role as operations manager, he oversaw a New Jersey-based terminal property. (*Id.* at 5). He was expected to testify that Lantzman charged the customer for the use of additional trucks that never assisted in snow removal, thereby falsely inflating the customer's invoice. (*Id*.). The Government's notice was broadly worded. At the final pretrial conference, the Government argued that its notice should be read broadly to encompass not only Patter's testimony, but similar testimony of "four or five" SIMCO operations managers. The Government did not offer the identities of these witnesses or any offers of proof regarding the content of their testimony.

Lantzman filed a reply to the Government's 404(b) notice objecting to the Government's notice and recent disclosure of other alleged bad acts. (ECF No. 84). Lantzman requested that the

Court exclude uncharged conduct predating the period covered by the Indictment as identified by the Government in their notice. (*Id.*).

> The Court held:
>
>> A necessary element to establish a claim for wire fraud is that the defendant acted with fraudulent intent. *Coleman.*, 684 F. Supp. at 595. An intent to defraud requires that a party act knowingly and with the intent to deceive or to cheat. *Id.* at 618. Patter's testimony, if believed, is relevant to establishing that Lantzman engaged in overcharging, knowing that he was defrauding his customers. Thus, . . . this evidence is intrinsic to the charged offenses because it is relevant to proving an element of the charged offenses – Lantzman's fraudulent intent. Patter's testimony is facially admissible. Should there be any further objections regarding the admission of Patter's testimony, the Court will consider such arguments upon timely trial objections.

(ECF No. 92, p. 3). In the alternative, the Court noted that Patter's testimony would be admissible under Rule 404(b):

>> [T]he Court will permit the Government to introduce Patter's testimony involving related fraudulent conduct to show Lantzman's intent, absence of mistake, or the lack of accident regarding the added services. Patter's proffered testimony is relevant to the Government's theory that Lantzman had knowledge regarding the fraudulent nature of his billing practices and engaged in a common scheme to defraud his customers. The Court agrees with the Government that Patter's testimony, as represented by the Government, may serve to undermine any defense that Lantzman believed the services were actually performed or that the billings were a result of an administrative mistake. Thus, as proffered, this evidence is offered for a proper purpose under Rule 404(b) – not to show character or propensity.

(*Id.* at 6). The Court rejected Lantzman's argument that Patter's testimony was inadmissible because it pertained to a New Jersey-based terminal where SIMCO did not use CrewTracker and used a different billing practice. (*Id.*). It held that potential differences do not turn the proffered evidence into improper character or propensity evidence. (*Id.*). Differences in contractual terms or billing practices may undermine the weight of the evidence but did not render the evidence inadmissible. (*Id.*). The Court noted that its order only applied to Patter's testimony and not the vaguely described similar testimony of "four or five" SIMCO operations managers. (*Id.* at 7 n.2).

At trial, Patter testified that at the Maher Terminal in New Jersey, Lantzman charged the customer for the use of a truck that did not provide services to the customer. (ECF No. 133, p. 264). Lantzman objected to Patter's testimony, preserving his objection previously raised at ECF No. 84. (*Id.* at 261). The Court reiterated its holding at ECF No. 92 – finding the evidence to be intrinsic to the charged offenses, and in the alternative, proper Rule 404(b) evidence that was noticed by the Government. (*Id.*).

The Court incorporates by reference its holdings at ECF No. 92 regarding this testimony and again holds, for the same reasons stated in its prior order, that the proffered evidence was intrinsic to the charged offenses.

According to Lantzman, the Government's notice regarding this testimony was "untimely and grossly inadequate." (ECF No. 129, p. 20). Given the Court's holding that this evidence was intrinsic, no notice was required. However, even assuming the evidence was only admissible under Rule 404(b), the Government's notice, describing Patter's proposed testimony in detail and filed over two weeks before the start of trial, was sufficient to provide Lantzman with a fair opportunity to meet Patter's testimony. *See United States v. Buckner*, No. 3:18-CR-00349, 2020 WL 211403, at *6 (M.D. Pa. Jan. 13, 2020) ("The Rules of Evidence do not set forth a specific time frame within which the Government must provide Rule 404(b) evidence. Rather, [w]hat constitutes reasonable notice in advance of trial [pursuant to Rule 404(b)] is determined by the circumstances and complexity of the prosecution. Courts have thus frequently found that the Government must disclose Rule 404(b) evidence no less than one to two weeks prior to trial." (internal quotation marks and citations omitted)); *United States v. Addison*, No. 2:23-CR-118, 2024 WL 4278289, at *11 (W.D. Pa. Sept. 24, 2024) ("Disclosure of [Rule 404(b) evidence] two weeks before trial generally amounts to reasonable notice of the [G]overnment's intent to use this kind of evidence).

Lantzman next argues that Patter's testimony regarding his alleged conduct at the Maher Terminal was prejudicial, damning, and "tainted the jury during the early days of . . . Lantzman's trial." (ECF No. 129, p. 21). Lantzman does not argue that the evidence was inadmissible under Rule 403. Evidence is not inadmissible simply because it may hurt the defendant. Evidence is only inadmissible under Rule 403 if it is *unfairly* prejudicial. *United States v. Long*, 92 F.4th 481, 488 (3d Cir. 2024) ("Not all prejudice is unfair prejudice, and Rule 403 bars only the latter. Evidence that reveals a defendant's legal guilt can be highly prejudicial, but that alone does not make it unfairly so. Instead, a risk of unfair prejudice exists when 'concededly relevant evidence [can] lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."); *United States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir. 1994) ("The damage done to the defense is not a basis for exclusion; the question under Rule 403 is one of unfair prejudice—not of prejudice alone. (internal quotation marks and citations omitted)); *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial, or it isn't material. The prejudice must be 'unfair.'"). Lantzman does not explain how Patter's testimony was unfairly prejudicial.

Notably, a key tenant of Lantzman's defense was that he did not know the services at issue were not rendered; thus, he acted in good faith and without the specific intent to defraud. Patter's testimony, if believed by the factfinder, was relevant to showing that Lantzman knew the services were not performed and thus, that he added the at-issue services to invoices with the intent to defraud his customers. The probative value of Patter's testimony substantially outweighed any danger of unfair prejudice.

Lantzman also argues that Patter's testimony regarding the Maher Terminal was "flatly wrong, irrelevant, and thus inadmissible." (ECF No. 129, p. 21). The Court already explained that the evidence was relevant and admissible in this Opinion and at ECF No. 92. Lantzman focuses his argument on his contention that "the 'other bad acts' never occurred." (*Id.*). In support of his argument, he cites the testimony of Vincent Cuozzo ("Cuozzo"), the director of operations at the Maher Terminal. (*Id.*). Cuozzo testified that it is not possible that the Maher Terminal was billed for a non-existent truck or hours. (ECF No. 139, p. 165). The Court acknowledges that there is a conflict between the testimony of Patter and Cuozzo. Nevertheless, conflicting testimony does not render evidence inadmissible. When the Court held that Patter's testimony was admissible, Cuozzo's testimony was not before the Court. However, even if it was, the Court's role in deciding whether evidence is admissible is to apply the Federal Rules of Evidence. The Court's role is not to assess witnesses and resolve conflicting evidence – to do so would be to usurp the role of the jury. Lantzman's arguments pertain to the weight of Patter's testimony, not its admissibility. Lantzman was free to highlight inconsistences and any alleged issues with the Government's investigation through cross-examination, his case-in-chief, and closing argument. (*See* ECF No. 140, p. 47 (arguing that Patter's testimony should be given little to no weight because "Patter was convicted of lying under oath or lying to authorities" and "Patter harbor[ed] negative thoughts about . . . Lantzman that have nothing to do with . . . Lantzman as a person"); *id.* (contending that the Government called Patter to testify about the Maher Terminal without speaking with Cuozzo); *id.* at 48 (drawing attention to the contradictions between Patter's and Cuozzo's testimony).

The Court holds that Patter's testimony was relevant and admissible. The admission of such testimony did not constitute a trial error and it will not grant Lantzman a new trial.

b.  Witness Statements regarding Past Customer Complaints

Lantzman contends that "the Government's *attempted* introduction of two unrelated customer complaints" also constitutes trial error. (ECF No. 129, p. 22) (emphasis added). At trial, the Government tried to admit two prior instances of SIMCO customers complaining that services were not appropriately provided. (ECF No. 137, pp. 129-31) (*see also* Gov. Exhibits 10 and 11). These complaints were seized during an execution of a search warrant at SIMCO's office. (*Id.* at 26). Lantzman raised a timely objection that these complaints were hearsay. (*Id.* at 129). The Government countered that the complaints were not being presented for the truth of the matter asserted but to show that Lantzman had knowledge that SIMCO customers were being billed for services that were not provided. (*Id.*).

The Court did not admit the complaints into evidence but instead permitted the witness to testify regarding the receipt of the complaints to show notice by an employee of SIMCO. (*Id.* at 132). The SIMCO employee who was asked about the complaints, Kelly, then looked at the first complaint and stated "[f]raudulent billing." (*Id.*). Lantzman objected and the Court instructed the jury to disregard Kelly's two-word statement. (*Id.* at 133). Lantzman now contends that Kelly's statement "fraudulent billing" substantially influenced the jury despite the Court's instructions. (ECF No. 129, p. 22). He does not take issue with the Court's holding regarding the complaints. He does not contend that the Court erred in permitting Kelly to testify that SIMCO received complaints where customers alleged that they were billed for services that were not provided. (*See* ECF No. 137, p. 133). Instead, he contends that Kelly's statement, which the Court instructed the jury to disregard, improperly influenced the jury.

Regarding curative instructions, the Third Circuit has stated:

'[T]he almost invariable assumption of the law [is] that jurors follow their instructions.' *United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). Therefore, '[we] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' *Id.* (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985).

*United States v. Franz*, 772 F.3d 134, 151-52 (3d Cir. 2014) (cleaned up).    Hence, Kelly's mere statement "fraudulent billing," which the jury was timely instructed to disregard, (*see* ECF No. 137, p. 133), does not constitute trial error.

### c.  Waters' Testimony

Lantzman next takes issue with the testimony of Gregory Waters, a former SIMCO sales and operations manager.  (ECF No. 129, p. 22); (ECF No. 138, p. 127).  Waters testified that a customer in Toano, Virginia reached out to him after receiving an invoice.  (*Id.* at 150).  The customer complained that there was a second plow service added to its invoice.  (*Id.*).  SIMCO records showed that the second plow service was written on the form during the administrative billing review process.  (*Id.* at 150-51).  Waters concluded that the service was not performed and submitted a billing adjustment form to remove the service from the invoice and get the customer a refund.  (*Id.* at 151).  During Waters' testimony, Lantzman objected on the grounds that the evidence regarding the customer in Toano, Virginia, was prior bad acts evidence, covered by Rule 404(b), that was not properly noticed by the Government.  (*Id.* at 147).  The Government responded that the evidence was not Rule 404(b) evidence.  The addition of the second plow service on this invoice was not a charged offense in the Indictment but was still intrinsic to the charged offenses since Waters' testimony pertained to an added service during the 2018-2019 winter season – the relevant time period in the Indictment.  (*Id.* at 148).  The Court ruled that Waters' testimony was intrinsic to the charged offenses since it was within the charged time period and directly relevant to the contested issue of Lantzman's intent.  (*Id.* at 149).

Lantzman argues that this testimony was improper in part because Waters testified that the Government did not ask him for any supporting documentation,  including the customer contract, invoice, storm summary report, or any other confirmation that the customer was actually billed for incorrect services. (ECF No. 138, pp. 190-91).  Waters also testified that he was not aware whether the Government corresponded with the particular customer at issue to verify that the service was not performed.  (*Id.* at 191-92).  Lantzman contends that Waters' testimony was improper because it was not corroborated by other evidence.

The Court reasserts its ruling that the evidence was intrinsic and thus not subject to the notice requirements of Rule 404(b).  It determined that evidence that Lantzman added services to customers' invoices via handwritten notes on storm summary reports during the charged period was relevant to show that Lantzman was engaged in a widespread scheme to defraud acting with the specific intent to deprive SIMCO's customers of money by charging them for services that were not provided.  This evidence, like in *Evans*, demonstrated an "overall scheme to defraud" leading to the charged wire fraud offenses.  *See Evans*, 571 F. Supp. 3d at 372.  It showed that the charged offenses were not "isolated event[s]."  *See id.* at 374.  Lantzman was free to attempt to undermine the Government's investigation at trial.  He did so.  The fact that Waters' testimony was not, according to Lantzman, supported by sufficient evidence does not render the testimony inadmissible.  The Court holds that the admission of Waters' testimony regarding the issue with the customer's invoice in Toano, Virginia, did not constitute trial error.

### 2.  *Alleged Burden Shifting*

Lantzman argues that "[t]hroughout the trial, the Government attempted to shift the burden of proof onto Lantzman to demonstrate that the services in question were completed."  (ECF No. 129, p. 23).  The Government counters that it clearly assumed the burden of proof throughout trial,

"including by referring at least four times during closing argument and rebuttal that the [G]overnment was required to prove [Lantzman's] guilt beyond a reasonable doubt." (ECF No. 141, p. 29). The Court holds that the Government did not violate Lantzman's constitutional right by commenting on his failure to testify nor did the Government attempt to shift the burden of proof onto Lantzman. Even if the Government did so, the Court holds that any purported burden shifting did not rise to the level of denying Lantzman due process.

The Fifth Amendment of the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. State of California*, 380 U.S. 609, 615 (1965). A remark is directed to a defendant's silence when "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir.1982) (internal quotation marks omitted) (quoting *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.1971)). Statements regarding the "absence of facts in the record[,]" however, "need not be taken as comment on [a] defendant's failure to testify." *Bontempo*, 692 F.2d at 959 (citing *Braxton v. Estelle*, 641 F.2d 392, 397 (5th Cir.1981)); *see also United States v. Brown*, 254 F.3d 454, 462-64 (3d Cir.2001) (holding that statements by the Government in its closing argument did not impermissibly comment on defendant's silence or shift burden of proof to the defense); *United States v. Semikian*, 307 F. App'x 107, 109 (9th Cir. 2009) ("[A] prosecutor's comments on the defendant's failure to present exculpatory evidence do not shift the burden of proof where the prosecutor reminds the jury that the burden of proof is on the [G]overnment.").

Prosecutorial comments on the defendant's silence at trial amount to a constitutional violation if the comments "so infected the trial with unfairness as to make the resulting conviction

a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The touchstone of this analysis is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating whether alleged misconduct rose to the level of a constitutional violation, the Court must examine the Government's conduct in the context of the trial as a whole, and "assess[ ] the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Reid v. Beard*, 420 F. App'x 156, 159 (3d Cir. 2011) (citing *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)). Although an individual remark may not create a due process violation, the cumulative effect of several such remarks may. *See Marshall v. Hendricks*, 307 F.3d 36, 63-64 (3d Cir. 2002).

Although Lantzman contends that the Government engaged in burden shifting throughout the trial, the only example cited in his brief is a statement during the Government's closing argument. (ECF No. 129, pp. 3-24). During the Government's closing argument, it stated: "Defendant didn't offer any explanation as to why these services . . . should be added." (ECF No. 140, pp. 8-9). At the time, Lantzman objected that the Government engaged in improper burden shifting. (*Id.* at 9-10). The Court found that the statement, taken in context, was not objectionable. (*Id.* at 10). Moreover, the Court noted that the Fifth Amendment language in its jury charge would cure any purported burden shifting that occurred. (*Id.*).

Viewing the statement in context, the Court holds that the Government's statement was not directed at Lantzman's silence or failure to testify at trial. Before the statement at issue, the Government was discussing the SIMCO operations meetings. (*Id.* at 8). The Government was remarking that Lantzman taught his operations managers, specifically Girardi, Waters, and

Marchinsky, to mark-up storm summary reports to add "fictitious" services to invoices in order to generate revenue for SIMCO. (*Id.*). The Government stated as follows:

> Third, you heard evidence that, in carrying out his scheme, the defendant caused a wire to be sent to his customers via email. Specifically, the defendant caused invoices to be sent to his customers all over the country. Those emails contained those fraudulent invoices, and you have those emails in evidence at Government's Exhibits 1A  through 6A. You heard customers testify that they received these emails in their corporate offices that are located in different states across the country.
>
> You heard testimony that defendant didn't add all of these services alone. He trained his operations managers, including Chris Girardi, including Greg Waters, including Kevin Marchinsky, to mark up storm summary reports. They acted at the defendant's direction. Defendant's own employees told you that he was a hands-on micromanaging boss. Nothing at SIMCO happened without his say-so.
>
> In fact, twice a year, you heard that the defendant called operations meetings. At these meetings, the defendant taught his operations managers how to mark up a storm summary report, how to add fictitious services onto the bills so that SIMCO could be paid for them.
>
> The managers understood the defendant's directions to mean that they were to add these services even if the subcontractor did not report them as having been performed.  The added services were marked with a notation like the one you see on Government's Exhibit 1 here, Pay SIMCO, which the operations managers testified meant that SIMCO and not the subcontractor would be paid for a service. This notation meant that SIMCO, and not the subcontractor, would be logged in CrewTracker as having performed that service.  *Defendant didn't offer any explanation as to why these services . . . should be added.*

(*Id.* at 7-9) (emphasis added).  After the side bar, the Government went on to argue:

> The defendant stated only, of the subcontractors, If they're not billing for it, then why shouldn't we?  If the subcontractor wasn't paid, the operations manager was supposed to tell the subcontractor why they weren't going to be paid for a given service.  You saw this instruction in Government's Exhibit 19, in the training PowerPoint, which states: Don't cut the SP pay without talking to them first.  It's not fair for them to receive a short check.   To preserve relationships with subcontractors, the sales and operations managers were to tell the subcontractors if they weren't going to be paid.  We asked every subcontractor who came and spoke to you in the last week whether or not SIMCO were – ever informed those subcontractors that they would not be paid for a particular service, and they all told you that they were never so informed.  Former SIMCO operations manager Brian

43

> Patter once confronted Lantzman about the issue of added services. In response, the defendant simply shrugged off Mr. Patter's concerns.

(*Id.* at 12).

While the Government's statement may have been inartful, the Court understood it as referring to its argument that Lantzman did not offer any explanation to his operations managers during their training as to why services should be added to storm summary reports that were not reported via CrewTracker. This point was clarified by the Government's argument after the sidebar which focused on Lantzman's instructions to SIMCO's operations managers regarding the payment of service providers. The statement was not of such a character that the jury would naturally and necessarily take it to be a comment on Lantzman's failure to testify or present evidence. Lantzman contends that the Government told the jury that it could convict Lantzman "for not carrying a burden that was never his to bear." (ECF No. 129, p. 24). The Court holds that the Government did not do so. The Government's statement, taken in the context of its closing argument, was not improper and did not shift the burden of proof.

Even assuming that the Government's comment was improper, the Court holds that it did not infect the trial with unfairness so as to deny Lantzman of due process.

It is of note that in his supporting brief, Lantzman did not point to any other instance where the Government attempted to shift the burden of proof. Throughout its closing argument, the Government referenced that it had the burden to prove Lantzman guilty beyond a reasonable doubt. (*Id.* at 5, 26-28, 58). Lantzman reiterated this fundamental principle throughout his closing argument. (*Id.* at 30). Finally, the Court charged the jury regarding the burden of proof and Lantzman's constitutional right not to testify or present a defense:

> Mr. Lantzman did not testify in this case. A defendant has an absolute constitutional right not to testify. The burden of proof remains with the [G]overnment throughout the entire trial and never shifts to Mr. Lantzman. Mr.

44

> Lantzman is never required to prove that he is innocent. You must not attach any significance to the fact that he did not testify. You must not draw any adverse inference against him because he did not take the witness stand. Do not consider, for any reason at all, the fact Mr. Lantzman did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

(*Id.* at 72); (*see also id.* at 74, 76 ("The presumption of innocence means that Mr. Lantzman has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden or obligation of proof is on the [G]overnment to prove that Mr. Lantzman is guilty, and this burden stays with the [G]overnment throughout the trial."), 86).[6]  The Court presumes that the jury understood and followed these instructions. *See Franz*, 772 F.3d at 151-52.

Lantzman argues that the jury's acquittal at Count Three, where he offered photographs and other evidence purportedly proving that the service at issue was performed, demonstrates that the jury did not understand that the Government had the burden of proof. (ECF No. 129, p. 24). This is not a persuasive argument. The Government did not present testimony of the service

---

[6] This mirrors the opening instruction given to the jury. (See ECF No. 89, pp. 12-13 ("After the Government has presented its evidence, Mr. Lantzman's lawyers may present evidence, but they are not required to do so. As I will tell you many times during trial, the Government always has the burden or obligation to prove each and every element of the offense charged beyond a reasonable doubt. Mr. Lantzman is presumed to be innocent of the charges. The law never imposes a burden on a defendant in a criminal case of proving his innocence by calling any witnesses, producing any exhibits, or introducing any evidence."); *id.* at 25-26 ("Mr. Lantzman has pleaded not guilty to the offenses charged. He is presumed to be innocent. Mr. Lantzman starts the trial with a clean slate, with no evidence against him. The presumption of innocence stays with Mr. Lantzman unless and until the Government presents evidence that overcomes the presumption by convincing you that he is guilty of an offense charged beyond a reasonable doubt. The presumption of innocence requires that you find Mr. Lantzman not guilty, unless you are satisfied that the Government has proven his guilt beyond a reasonable doubt. The presumption of innocence means that Mr. Lantzman has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden or obligation of proof is on the Government to prove that Mr. Lantzman is guilty, and this burden stays with the Government throughout the trial. In order for you to find Mr. Lantzman guilty of the charged offenses, the Government must convince you that he is guilty beyond a reasonable doubt. That means that the Government must prove each and every element of the offenses charged beyond a reasonable doubt."). From the onset of trial, the jury was instructed that the Government bore the burden of proof and it had to prove Lantzman's guilt beyond a reasonable doubt.

provider who allegedly provided the services at issue in Count Three. Thus, the jury's acquittal at Count Three actually serves as confirmation that the jury held the Government to its burden of proof and found that where the Government did not call the service provider to testify, it did not prove beyond a reasonable doubt that the service was not rendered.

In his reply, Lantzman argues that the Government's "core theory equates absence of affirmative documentation confirming services were performed were conclusive proof beyond a reasonable doubt that services were not rendered, which unconstitutionally shifted the burden of proof to . . . Lantzman." (ECF No. 142, p. 1).[7] Lantzman's reply brief morphs his burden shifting argument from one centered around the Government's remark during its closing argument to a fundamental issue with the way the Government presented its case. (*Id.* at 2 (stating that burden shifting "infected the entirety of the Government's case")).

The Government contended that the services were not performed and that the lack of documentation, i.e., payment to service providers or entries in CrewTracker, served as *some* evidence that the services were fraudulently added to customer invoices. This was not improper, particularly because Lantzman's theory of the case was that the disputed services were actually performed.[8]

---

[7] The Court need not address arguments raised for the first time in a reply brief. *Marcum v. Columbia Gas Transmission, LLC*, 549 F. Supp. 3d 408, 420 n.4 (E.D. Pa. 2021). While Lantzman addressed burden shifting in his brief supporting his motion for a new trial, ECF No. 129, pp. 23-24, Lantzman stopped short of arguing that the Government's *entire theory* of the prosecution constituted burden shifting. Nevertheless, the Court will address this issue.

[8] Lantzman argued throughout trial that the services at issue were rendered and thus cannot be the basis of wire fraud convictions. (ECF No. 149, pp. 25-28 (introducing the theory, during Lantzman's opening statement, that these adjustments were "normal business practice[s]" to ensure that customers were accurately billed for the services rendered); (*see* ECF No. 140, pp. 32. 36, 49 (presenting this theory throughout his closing argument)).

"A prosecutor is permitted . . . to comment on the failure of defense counsel to point to evidence in the record that supports the defense's theory of the case." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996). "Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence." *Id.* The Court holds that arguing that a service provider was not paid for rendering a service, or that the service was not documented in CrewTracker or on a billing adjustment form, is relevant to whether the service was actually provided is a proper argument. From the lack of payment, the jury could have inferred that the service was fraudulently added to the invoice, SIMCO/Lantzman pocketed the money, and thus the service provider was not paid for a service that it did not perform.

The Government did not engage in burden shifting when it argued that the lack of affirmative evidence that a service was performed is some evidence that the service was not actually rendered – especially when it was SIMCO's usual practice to document performed services through CrewTracker logs, billing adjustment forms, and payment to service providers.

The Government's case did not rest solely on the contention that a service was not documented, thus it was not performed. The Government presented the testimony of numerous operations managers who stated that they were instructed to add services that were not performed to storm summary reports. (ECF No. 133, pp. 60-61); (ECF No. 138, pp. 131-32 (discussing an email instructing operations managers to add shoveling services even when the service providers cleared properties using only salt to "not lose that money as a company")). There could have been administrative errors in documenting services. This is a possible interpretation of the evidence at issue. Lantzman was free to, and did, argue at trial that administrative errors explained the lack of payment to the service providers and documentation in CrewTracker. However, the Government

was likewise free to argue that the lack of payment and documentation could be interpreted as evidence of a scheme to defraud. Doing so did not shift the burden to Lantzman. The Court will not substitute its judgment for that of the jury's by granting Lantzman a new trial based on evidence that could reasonably be interpreted multiple ways.

Finally, Lantzman argues that "not a single customer was contacted by the Government to verify allegations of fraudulent overbilling until 2025, six years after the execution of the search warrant and more than a year following the [I]ndictment." (ECF No. 142, p. 4). He contends that this somehow improperly shifted the burden, "rendering the evidence legally insufficient." (*Id.*). The Court does not understand how alleged flaws or delays in the Government's investigation could possibly constitute unconstitutional burden shifting. Nevertheless, the Court notes that Lantzman contested the thoroughness and accuracy of the Government's investigation at trial, as he was permitted to do. Any purported flaws in the Government's case do not constitute burden shifting, but rather, were issues for Lantzman to highlight at trial.

The Court will not grant Lantzman a new trial based on the Government's alleged burden shifting. The Court holds that the statement at issue during the Government's closing argument was not a remark directed at Lantzman's silence or failure to present a defense. Even if interpreted in this way, when considering the trial as a whole, the remark did not deny Lantzman due process. Furthermore, the Government's theory of the case, that the lack of affirmative evidence that a service was performed is some evidence that the service was not performed, was not improper and did not shift the burden of proof to Lantzman.

    3.   *The Government's Alleged Suggestion that Service Providers Were Victims of Lantzman's Scheme*

Lantzman argues that the Government improperly suggested that the service providers were the victims of his alleged fraudulent scheme. (ECF No. 129, p. 24). As part of his pre-trial

motions in limine, Lantzman sought to preclude "[a]ny reference at trial to the nonpayment of a [service provider] as fraudulent" because (1) the Indictment did not allege a scheme to defraud service providers, (2) the contracts between SIMCO and the service providers expressly stated that the service providers' right to payment was forfeited if they did not report services in a timely manner, and (3) the federal fraud statutes were not intended to apply to breach of contract disputes. (ECF No. 58, p. 1). The Court denied Lantzman's motion stating:

> [SIMCO] serves as a middleman between customers of snow removal services and the subcontractors who perform the requested services. The fact that customers were allegedly billed for services not performed and, as a result, no associated payments were made to subcontractors, is relevant to the alleged offenses. Indeed, the fact that "no portion of such payments (of customers) [were] passed on to the subcontractors" is specifically mentioned in the Indictment. (ECF No. 3, ¶12). While Lantzman's motion is denied, the Court notes that Lantzman is charged with defrauding his customers, not subcontractors. The Court will allow evidence of non-payment of subcontractors. However, it will not allow the Government to argue (or otherwise suggest) that Lantzman engaged in fraudulent conduct against the subcontractors.

(ECF No. 75, p. 1). In his motion seeking a new trial, Lantzman does not appear to object to the Court's pre-trial holding, but contends that the Government violated the Court's ruling by repeatedly arguing that the service providers were victims of the alleged scheme to defraud. Lantzman highlights several instances where he alleges the Government violated the Court's holding during Agent Bell's testimony and the Government's closing argument. (ECF No. 129, p. 24).

One of the documents that Bell relied on in creating Government Exhibit 48 was whether the service provider was paid for the disputed services. (ECF No. 139, p. 7); (*Id.* at 124-25). Bell testified that "if the [service provider got paid for the added service, then, yet again, no fraud." (*Id.* at 7). In relation to discussing the creation of Government Exhibit 48, Bell testified that a specific service was not included on the spreadsheet because it was "not a fraudulent service added.

It was service provided; service paid for. [Service provider] was paid for the services that he documented as providing." (*Id.* at 41). When Lantzman objected to this testimony, the Court held that Bell's testimony did not classify or treat the service providers as victims. (*Id.* at 42). During its closing argument, the Government stated in various ways that "when [Lantzman] added a charge to a storm summary report and wrote, 'Pay SIMCO,' that meant the [service provider] didn't get paid. Instead, [Lantzman] pocketed that money." (*Id.* at 18; *see also id.* at 6, 16, 21).

Lantzman appears to misunderstand the Court's ruling. The Court held that the Government may not argue or suggest that the service providers were victims of Lantzman's scheme to defraud. (ECF No. 75, p. 1). Lantzman argues that the Government violated this ruling by eliciting suggestive testimony and arguing that "nonpayment of service providers was evidence of fraudulent conduct." (ECF No. 129, p. 24). The Court held that evidence that customers were billed for services and no associated payments were made to service providers was relevant to the charged offenses and was circumstantial evidence of the alleged scheme to defraud. (ECF No. 75, p. 1). The Government did not violate the Court's holding by arguing that evidence that service providers were not paid is some evidence that the services were not actually rendered. Its evidence and/or arguments cannot be reasonably construed as referring to the service providers as victims of the scheme to defraud.

Lantzman does not raise any other argument as to why the evidence at issue and the Government's statements constitute trial error. He does not contend that the evidence was inadmissible or improper in any other manner. The Court understands Lantzman's argument that there may be some explanation, other than fraud, as to why the service providers were not paid. For instance, it is possible that the service providers did not enter the services into CrewTracker in a timely manner and thus were not paid in accordance with their contract with SIMCO. (*See* ECF

No. 135, p. 32). Nevertheless, the jury could reasonably conclude that if a service provider was paid for a service, they rendered the service. If a service provider was not paid for a service, the jury could infer that this was because the service was not actually performed. Then, when the customer was charged for the service, it is reasonable for the jury to conclude that this service was fraudulent. Certain evidence may be consistent with an explanation other than criminal conduct. Nevertheless, this does not render the evidence inadmissible. It is the jury's role to assess the credibility of witnesses and assign weight to evidence. The Court holds that the Government's references to the service providers not being paid for services charged to customers did not violate the Court's pre-trial ruling and does not constitute trial error.

### 4. Government Exhibit 48

Lantzman contends that Government Exhibit 48 was inadmissible because it was highly influential on the jury and was "plagued with errors of methodology, fact, and logic." (ECF No. 129, p. 25). The Government counters that the summary exhibit complied with Federal Rule of Evidence 1006 ("Rule 1006") and was properly admitted. (ECF No. 141, pp. 32-33). The Court holds that the exhibit was admissible and thus not the basis of trial error.

The Government described Government Exhibit 48 as follows:

> During execution of a search warrant at Defendant's business, the [G]overnment seized thousands of pages of hard-copy Storm Summary Reports, as well as electronic records that included QuickBooks records for the relevant time period and electronic copies of Storm Summary Reports. Government's Exhibit 48 summarizes these voluminous and admissible records by detailing each of the roughly 3,900 times where: (i) a hard-copy Storm Summary Report seized during execution of a search warrant at SIMCO's business was found to contain a handwritten note directing a service to be added to an invoice; (ii) QuickBooks records, likewise seized during execution of a search warrant at SIMCO's business, show that the customer was billed for that service; and (iii) QuickBooks records show that the subcontractor was not paid for providing the service. The second column lists the substance of the handwritten note from the Storm Summary Report. (Exhibit 1). The first column lists the customer to whom the subject Storm Summary Report pertains, and the third and fourth columns detail the cost of the

added service and the relevant memo line from the applicable invoice (providing date, time, and type of service), respectively. The final column lists the city and state of the customer. (Exhibit 1). All of this information, save the handwritten note from the Storm Summary Report, is contained within the QuickBooks records.

(ECF No. 66, pp. 3-4). In his pre-trial motion in limine, Lantzman sought to exclude this exhibit arguing that (1) the documents and records underlying the exhibit were inadmissible hearsay; (2) the Government failed to produce a complete and accurate set of documents underlying the exhibit, and as a result, Lantzman was denied a meaningful opportunity to verify, assess, or challenge the exhibit; and (3) the exhibit was inadmissible under Rule 403. (ECF No. 63, pp. 4-11). The Court denied that motion. Lantzman now argues that Government Exhibit 48 was inadmissible because the Government never made a full and complete production of the supporting materials underlying the exhibit, violating Rules 1006 and 106. (ECF No. 129, p. 25). Lantzman also appears to argue that the underlying records were inadmissible; however, this argument was not well developed in his post-trial briefing. (*Id.*).

Rule 1006 states in relevant part:

**(a) Summaries of Voluminous Materials Admissible as Evidence**. The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence.

**(b) Procedures.** The proponent must make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

FED. R. EVID. 1006. It permits parties to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury. *See Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir.1961) ( "[T]he use of a summary is a matter that rests within the sound discretion of the trial court."). Further, Federal Rule of Evidence 106 ("Rule 106") states: "If a party introduces all or part of a statement, an adverse party may require the introduction, at

that time, of any other part – or any other statement –that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." FED. R. EVID. 106.[9]

First, the records underlying Government Exhibit 48 were admissible. Government Exhibit 48 was created from three different types of documents: storm summary reports; QuickBooks records showing that the customer was billed for that service; and QuickBooks records showing that the service provider was not paid for providing the service. The Government established at trial that all three categories of records fell within the Federal Rule of Evidence 803(6) business records exception to hearsay. (ECF No. 139, pp. 5-9); *see also* FED. R. EVID. 803. Further, the handwritten notes on the storm summary reports were not hearsay because the Government did not admit the notes for the truth of the matter asserted. Instead, the notes were verbal acts directing SIMCO employees to add certain services to customer invoices. *See United States v. Saada*, 212 F.3d 210, 218 n.8 (3d Cir.2000) (stating that verbal acts do not constitute hearsay because they are not being offered for the truth of the matter, but rather, are relevant for the mere fact that they were spoken). Thus, the Court holds that the records underlying Government Exhibit 48 were admissible.

Second, the Court rejects the contention that Government Exhibit 48 should have been excluded because the Government failed to produce the underlying material. The Government has repeatedly represented that it produced to Lantzman all the records underlying the exhibit, and that

---

[9] Rule 106 relates to the admission of parts of a statement or record that must be admitted when an adverse party admits all or part of the statement at issue. FED. R. EVID. 106. Here, Lantzman contends that Government Exhibit 48 was inadmissible because the Government did not produce all the underlying records. Lantzman never attempted to admit into evidence any records that were not previously admitted under Rule 106. Thus, the relevant rule of evidence is Rule 1006(b) relating to the production of documents underlying summary exhibits. Nevertheless, since Lantzman raised Rule 106, the Court holds that the admission of Government Exhibit 48 did not violate Rule 106.

what Lantzman seeks are additional records beyond the scope of the summary. (*See* ECF No. 141, p. 32 (stating that the purportedly missing records are certain hard-copy pages of a storm summary report which were not summarized in Government Exhibit 48 and noting that Lantzman has three electronic copies of the storm summary report at issue)).  Further, the records summarized by Government Exhibit 48 are SIMCO records and thus records from Lantzman's business, presumably within his custody and control.  The Court credits the Government's representation that Lantzman retained access to copies of his records stored in electronic form and that it allowed Lantzman to review all the hard-copy documents in its possession.  The Court does not have any evidentiary basis to find that the Government wrongfully withheld any documents in its possession.  It credits the Government's representation that Government Exhibit 48 was based on material that was made available to Lantzman.  Thus, the Court finds that the Government complied with the requirements of Rules 1006(b) and 106.

Finally, to the extent Lantzman renews his Rule 403 argument, the Court holds that Government Exhibit 48 was admissible under Rule 403.[10]  Lantzman previously argued that, even if otherwise admissible, Government Exhibit 48 should be excluded under Rule 403 because of the risk of unfair prejudice and the risk of misleading the jury.  According to Lantzman, the exhibit was self-selecting and overly general in its treatment of the underlying evidence.  (*See* ECF No. 61, p. 10) ("In creating its Summary Exhibit, the Government carefully selected and produced only

---

[10] While Lantzman did not directly renew his Rule 403 argument in his motion seeking a new trial, he raised an objection "on the same grounds" as his pre-trial motion in limine.  He further argued that Government's Exhibit 48 was created from "cherry picked partial records, authored by numerous parties, from various stages of the billing process, with inconsistent reporting dates/times." (ECF No. 129, p. 26); (*see also* ECF No. 142, p. 1 ("The Government's fraud theory presented to the jury rests on fundamentally flawed and unreliable evidence derived from an incomplete investigation, particularly reflected in its reliance on Government Exhibit 48.")).  Thus, the Court will re-address Lantzman's Rule 403 argument.

certain excerpts from storm summary reports, rather than the storm summary reports in their entirety."). This is the very nature of a summary exhibit. *See United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018) ("A Rule 1006 summary chart need not accurately reflect all the facts in the case; it merely must accurately represent the facts that it purports to summarize. So long as they are accurate, however, such summaries may present only one party's side of the case." (internal citations and quotation marks omitted)).

Lantzman also argues that Government's Exhibit 48 was "plagued with errors of methodology, fact, and logic." (ECF No. 129, p. 25). Summary exhibits must accurately represent the facts that they purport to summarize. Lantzman takes issue with the steps that Agent Bell took to create the exhibit. (*Id.* at 13). He argues that there was no basis to rely on her testimony since she did not review emails from operations managers, contact service providers, verify GPS data from providers, solicit customer complaints, review vendor pay sheets, or consult other documentary evidence. Lantzman further argues that Government Exhibit 48 was "riddled with errors" because Bell testified that she cannot confirm that each one of the more than 3,900 services on the exhibit were not performed. (ECF No. 139, p. 14). In his original brief, Lantzman did not cite to a single error in Government Exhibit 48. (*See* ECF No. 129). However, in his reply, Lantzman highlights several purported errors. Lantzman cites line item 25 which reflects a charge for "salt walks and salt lot," allegedly added by Lantzman. (ECF No. 142, p. 8). However, the invoice cited by the Government as corresponding to that entry reads "plow lot and shovel walks." (*Id.*). At trial, Bell agreed that the description of the services included on the invoice were different from the description of services that Lantzman listed on line item 25. (ECF No. 139, p. 93). Since she did not have the supporting documentation in front of her on the witness stand, Bell testified that she could not explain the discrepancy. (*Id.* at 93-94). Lantzman contends that there are thirty-

seven (out of 3,900) additional line items with similar discrepancies between the services added by Lantzman and those actually invoiced to customers.

The Court notes that Government Exhibit 48 summarized over 3,900 services. It would have been difficult, if not impossible, for the Government to engage in Lantzman's proposed review process for every service listed. Government Exhibit 48 accurately represented what it purported to represent: instances where services were added to storm summary reports, services were billed to customers, and service providers were not paid for the service. The Government was clear, its summary exhibit represented instances where hard-copy storm summary reports contained a handwritten note directing that a service be added, the QuickBooks records showed that the customer was billed for that service, and the service provider was not paid for that service. (ECF No. 140, p. 6). Lantzman was free to, and did, attack the Government's investigation process at trial. (*See* ECF No. 139, p. 55). Lantzman cross-examined Bell and drew attention to the documents that she did not consider in creating Government Exhibit 48. During his closing argument, Lantzman highlighted the alleged deficiencies in the exhibit. (ECF No. 140, pp. 48-49). The admission of Government Exhibit 48 did not constitute trial error.

With regard to the purported inaccuracies in Government Exhibit 48, Lantzman had the exhibit and the underlying exhibits available for his examination before trial. Lantzman failed to bring any of these alleged errors to the Court's attention prior to trial or the admission of Government Exhibit 48. The Court does not understand how alleged errors, arguably highlighted in testimony after the admission of Government Exhibit 48, could render the exhibit inadmissible in a post hoc fashion. Further, Lantzman does not explain how these purported typographical errors, allegedly present in approximately 37 out of 3,900 line items in the summary exhibit (less than 0.95%), could have been so influential so as to prejudice the jury. The exhibit was already

admitted when this testimony was presented. Lantzman's arguments go to the weight of Government Exhibit 48, not its admissibility. He appropriately argued at trial, through his cross-examinations and closing argument, that Government Exhibit 48 was not persuasive due to a lack of investigation and errors. (*See* ECF No. 139, p. 55); (ECF No. 140, pp. 48-49).

## IV.    CONCLUSION

The Court holds that the jury's verdict was rational and based on sufficient evidence. The Court will not enter a judgment of acquittal because "a reasonable jury believing the [G]overnment's evidence could find beyond a reasonable doubt that the [G]overnment proved all the elements of the offenses." *See United States v. Samuels*, 741 F.2d 570, 573 (3d Cir. 1984). The Court defers to the jury's finding and draws all reasonable inferences in favor of the jury verdict. *See United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010). Treating all the incriminating evidence as true and credible, Lantzman has not met the "extremely high" burden imposed on defendants who raise challenges to the sufficiency of the evidence underlying jury verdicts. *See id.*

Further, the Court will not grant Lantzman a new trial. The jury verdict is not contrary to the weight of the evidence. Nevertheless, even if it was, the Court holds that there is no serious danger that a miscarriage of justice occurred – that is, there is not a serious risk that an innocent person was convicted. *See Silveus*, 542 F.3d at 1004-05. This is not the exceptional case warranting overturning the jury's verdict. *See id.*

For the foregoing reasons, the Court will deny Lantzman's Motion for a New Trial Pursuant to Fed. R. Crim. P. 33 (ECF No. 128) and Motion for a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 (ECF No. 130). An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6/23/25

Dated